HILLER & SKOGLUND, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ATLANTIC CREOSOTING COMPANY, INC., A MARYLAND CORPORATION, DEFENDANT-RESPONDENT, AND CONTINENTAL CASUALTY COMPANY, AN ILLINOIS CORPORATION, UNIVERSAL PILE CO., INC., A NEW JERSEY CORPORATION, AND BOROUGH OF WOOD-RIDGE, A MUNICIPAL CORPORATION, DEFENDANTS.

Argued November 5, 1962—Decided April 23, 1963.

*Mr. Aaron W. Nussman* argued the cause for plaintiff-appellant (*Messrs. Back and Nussman*, attorneys).

*Mr. Ira D. Dorian* argued the cause for defendant-respondent.

The opinion of the court was delivered by

HALL, J. This case involves the right of a creditor to apply an unallocated payment by a debtor, who owes him more than one debt, to that obligation the creditor may select. More particularly, it concerns any limitation thereon where the application made by the creditor detrimentally affects the interests of a third party who is a guarantor of one of the other debts and furnished the funds out of which the payment was made. The third party won in the trial court, the Appellate Division reversed, deciding in favor of the creditor, 73 *N. J. Super.* 225 (1962), and we granted certification on the third party's petition. 38 *N. J.* 360 (1962).

The question arises in this quite common factual setting. The plaintiff (Hiller), the third party, was the prime contractor on a public construction job for defendant Borough of

Wood-Ridge. Hiller subcontracted a portion of the work to defendant Universal Pile Co., Inc. (Universal), the debtor, at a price of $39,815.75. Universal purchased materials for the subcontract from defendant Atlantic Creosoting Company, Inc. (Atlantic), the creditor, at a cost of $22,393.30. At the time Universal also owed Atlantic $26,707.53 on an unsecured book acount, extending back many months, for materials furnished for other jobs not involving Hiller. Universal's financial condition was somewhat precarious and Atlantic had been continually pressing for payment.

Universal completed the subcontract in January 1960 and billed Hiller a few days later for the full price. Hiller paid Universal's bill on February 19 from an installment payment on the prime contract received from the borough. On the same day Universal remitted $15,000 to Atlantic out of the payment received from Hiller, without, as the Appellate Division properly found, any direction as to how the money was to be applied. Atlantic had apparently simply added the charge for the Hiller job materials to Universal's book account and it credited the $15,000 to the earliest unpaid items in that account. A week later representatives of Atlantic and Universal conferred about the latter's total debt which now amounted to about $35,000 after the $15,000 credit. As will be pointed out more fully, Atlantic knew the source of the payment and seasonably advised Universal of its application to the antecedent debt.

On April 27 Atlantic filed a timely notice of lien claim with the borough under the municipal mechanics' lien law, *N. J. S.* 2A:44-125 *et seq.*, on moneys due or to grow due to Hiller pursuant to the prime contract. The claim was in the full amount of Atlantic's $22,393.30 charge to Universal. More than that sum remained to be paid by the borough to Hiller under the prime contract. A few days later Universal sent Atlantic a check for $5,000, marked "on a/c." The source of this payment was other than the Hiller remittance to Universal. Atlantic also credited it to Universal's prior indebtedness. Sometime thereafter the borough advised Hiller of the

lien claim and the latter promptly commenced this litigation in the Chancery Division to discharge the lien. No further payments were ever made to Atlantic by Universal on its total debt and Universal has become financially irresponsible. It did send a check to Atlantic at a later date for $2,393.30, the balance of the charge for the Hiller job material after the $15,000 and $5,000 payments, which bore the notation "Hiller and Skoglund paid in full." Atlantic refused to accept it for that reason, but the parties stipulated that, in any event, Universal did not have the funds to make the check good.

The trial judge found factually that Universal had directed Atlantic to apply the $20,000 to the charge for the material furnished for the Hiller job and that Atlantic had so agreed as well at the conference. He therefore decided in Hiller's favor by utilizing the first of the somewhat mechanical common law rules respecting application of payments made by a debtor owing more than one debt, *i. e.*, the creditor must apply the payment as the debtor directs. (The second of the rules allows the creditor to make the application as he sees fit if the debtor gives no direction; the third is ordinarily stated to be that if neither debtor nor creditor allocates, the court will apply the payment as justice requires, generally to the advantage of the creditor in the absence of supervening equities. For the most recent statement of the rules and supporting authorities, see *Borough of Totowa v. American Surety Co. of N. Y.*, 39 *N. J.* 332, 338–339 (1963).) The court discharged the lien claim in its entirety, even with respect to the $2,393.30 balance, under the principle that a lien is completely void when filed for a grossly excessive amount.[1]

---

[1] Procedurally, Hiller's action to discharge the lien claim was brought under *N. J. S.* 2A:44–137. Hiller also demanded that the borough pay over the $22,393.30 to it as due under the prime contract. The borough sought to interplead the sum, *N. J. S.* 2A:44–141. (The money has since been deposited in an interest-bearing account in a financial institution by order of the trial court, its disposition to await

On Atlantic's appeal from the discharge of the lien claim, the Appellate Division reversed on new findings of fact. *R. R.* 1:5–4(b), 2:5. It decided that the evidence did not support a finding that Universal had directed the application of the two payments to the Hiller job or that Atlantic had agreed so to allocate them. Consequently it held proper Atlantic's application thereof to the antecedent indebtedness by virtue of the rule giving the creditor that right when the debtor gives no direction, and ordered the reinstatement of the lien claim in full. The result is that Hiller must pay the $22,393.30 twice and Atlantic receives a windfall to reduce Universal's prior debt, otherwise uncollectible. It will be observed that this is not a case where the materialman has received no payment at all by reason of the utilization of contract payments for unrelated purposes by the prime contractor or, except beyond the $15,000, by the subcontractor, but rather one where the materialman received the last mentioned sum as a result of proper remittances down the contractual ladder, with knowledge of the source of the money.

While Hiller urges here that the Appellate Division erred in overturning the findings of the trial judge, we are satisfied the independent factual conclusion of the intermediate court was eminently justified and indeed the only result that could reasonably be reached on the evidence.

---

the final outcome of the litigation). Atlantic counterclaimed and cross-claimed to enforce its lien and determine the respective amounts due, *N. J. S.* 2A:44–137 and 140, and for judgment against Universal for the sum still owing on the latter's total indebtedness to it after determination of the lien. Hiller's surety on its required bond to the borough, Continental Casualty Company, was also joined in the action, but is not involved in the case since Hiller is entirely solvent. By supplemental complaint Hiller sought judgment against Universal for any amount which Atlantic might recover on its lien claim. The Chancery Division, beside discharging the lien claim in full, directed the payment of the $22,393.30 to Hiller, and gave Atlantic judgment against Universal for $30,612.83 plus interest. This was the amount remaining due from Universal to Atlantic on the former's total indebtedness after disallowance of the lien claim. Since the lien was held invalid *in toto*, there was no reason for any judgment against Universal on Hiller's supplemental complaint.

■ The Appellate Division did not pass upon Hiller's alternative argument—which is the important question before us—that the equities of the situation preclude Atlantic from utilizing the payment application rule. We think the contention has substantial merit and that Atlantic was required to apply the $15,000 payment to the charge for the Hiller job. This conclusion turns not on a court's making the application where neither party did, but rather on a determination that, under the particular circumstances, it is inequitable to allow the creditor to select.

The complete circumstances involve not only the factual elements previously outlined, but also the legal relationships of municipal owner, prime contractor, subcontractor and the latter's materialman. These incidents are created by statutes, the pertinent aspects of which may be briefly summarized. We refer at this point to the municipal mechanics' lien law, *N. J. S.* 2A:44–125 to 142, inc., and the bond act, *N. J. S.* 2A:44–143 to 147, inc. Both are designed to afford security to subcontractors and to materialmen and laborers having a contractual relationship either with a prime contractor or a subcontractor.

■ The lien law, first in chronology of enactment (see the legislative history of this and related statutes outlined in *Key Agency v. Continental Casualty Co.,* 31 *N. J.* 98 (1959)), gives these persons when unpaid a lien "for the value of the labor or materials, or both, upon the moneys due or to grow under the contract and in the control of the public agency * * *." *N. J. S.* 2A:44–128. The extent of protection is limited to the amount owing by the agency-owner to the prime contractor at the time the notice of lien claim is filed or thereafter becoming due. The former cannot be liable for more than the total amount of the prime contract, provided it pays the prime contractor in accordance with the terms thereof and withholds a sum sufficient to cover lien claims filed, and satisfaction of the claim cannot be had out of the public property which is the subject of the project. In this respect the municipal lien law differs in basic theory

from that applicable to private construction work where the owner does not file his general contract, *N. J. S.* 2A:44–66 and 75, insofar as unpaid subcontractors, materialmen and laborers are concerned, and is substantially analogous to the "stop notice" procedure provided for in private jobs where the contract has been filed, *N. J. S.* 2A:44–77 *et seq.* The important thing in the present context is that a prime contractor may become responsible, by virtue of the municipal lien law, for amounts due persons furnishing labor or materials to the work with whom he has no contractual relationship.[2]

 The bond act, *N. J. S.* 2A:44–143 to 147, inc., adopted in 1918, requires the prime contractor to furnish the agency with a surety bond, not only guaranteeing performance of the principal contract, but also including the "additional obligation for the payment by the contractor, and by all subcontractors, for all labor performed or materials * * * used * * * in, upon, for or about the construction * * * ." *N. J. S.* 2A:44–143. (There is no statutorily required counterpart with respect to private projects.) Subcontractors, materialmen and laborers are expressly made beneficiaries of the bond and have a direct right of action upon it. *N. J. S.* 2A:44–146 and 147. Generally speaking, the benefits of the bond act are broader and the protection greater than the right of lien. *Key Agency v. Continental Casualty Co., supra* (31 *N. J.,* at *p.* 107); *Morris County Industrial Park v. Thomas Nicol Co.,* 35 *N. J.* 522

---

[2] In its original form, *L.* 1892, *c.* 232, *s.* 5, *p.* 371, the municipal law did not afford a right of lien on the contract price to an unpaid laborer or materialman of a subcontractor where the prime contractor had paid the subcontractor in full, as in the instant case. This limitation was removed when the law was revised substantially to its present form by *L.* 1918, *c.* 280, *s.* 5, now *N. J. S.* 2A:44–129. *Wills v. James,* 99 *N. J. Eq.* 10 (*Ch.* 1926), affirmed o. b. 100 *N. J. Eq.* 360 (*E. & A.* 1926); *Atlantic City Lumber Co. v. City of Atlantic City,* 104 *N. J. Eq.* 483 (*E. & A.* 1929). In some jurisdictions a comparable restriction still exists, apparently by reason of the particular statutory language or scheme. Note, "Mechanics' Liens and Surety Bonds in the Building Trades," 68 Yale *L. J.* 138, 149 (1958).

(1961). In present significance, it is enough to state that the statute makes the prime contractor absolutely responsible to unpaid materialmen and laborers of a subcontractor. (The act does not require a subcontractor to give a bond to the prime contractor guaranteeing the payment of those furnishing labor or materials to him and none was supplied by Universal in this case.) This obligation is without limitation to the balance of the prime contract price remaining in the hands of the public agency and is generated by the unpaid party's simply filing a statement of the amount due him within 80 days after the acceptance of the work. *N. J. S.* 2A:44–145. So the prime contractor, by virtue of the bond, becomes a surety for the subcontractor, albeit an involuntary and uncompensated one. *Fidelity and Deposit Company of Maryland v. McClintic-Marshall Corp.,* 115 *N. J. Eq.* 470, 475 (*Ch.* 1934), affirmed o. b. 117 *N. J. Eq.* 440 (*E. & A.* 1935).

These legal relationships stood in this posture until the passage of the third pertinent statute — the trust fund act, enacted in 1932. *N. J. S.* 2A:44–147 (misnumbered; it should be designated 2A:44–148 and will be so referred to hereafter). In the interim, *Grover v. Board of Education of the Township of Franklin,* 102 *N. J. Eq.* 415 (*Ch.* 1928), affirmed o. b. 104 *N. J. Eq.* 197 (*E. & A.* 1929), was decided. Atlantic relies heavily upon this case and it appears the Appellate Division thought it controlling.

In *Grover,* the Board of Education contracted with Stout to build a school house, who furnished the requisite payment bond with surety. He purchased materials from the plaintiff to whom he was already indebted for a large sum on an open account. Stout paid the plaintiff, out of contract payments received from the board, more than the cost of the materials, without direction as to how the money should be applied. The plaintiff knew the source of the funds and applied them to the prior book account. Thereafter the plaintiff filed a notice of lien claim with the board for the full price of the school house materials. Stout abandoned the job and his

surety completed it. The surety, as subrogee of the contractor, was entitled to the balance of the contract price in the board's hands, less the amount of the lien claim if that was valid. That question came up for decision as between the plaintiff and the surety in the former's action to enforce the lien claim. The court upheld the lien, applying the rule of the right of the creditor to allocate payment as he chooses in the absence of direction by the debtor. In doing so, it recognized a split of authority among other jurisdictions in applying the payment rules in this type of situation, with the numerical weight of authority against the position taken.

While the case differs factually from the one at bar in that there was no subcontractor, the materialman having a direct relationship with the contractor, and in that a voluntary surety was involved, who was compensated for the risk it took, the basis upon which the result was put is broad enough to include our situation. Indeed, perhaps the leading case for the line of authority which the court chose to follow utilized the same reasoning in a factual situation identical with that before us. *Standard Oil Co. v. Day,* 161 *Minn.* 281, 201 *N. W.* 410, 41 *A. L. R.* 1291 (*Sup. Ct.* 1924). The *Grover* rationale was that moneys paid to the contractor by the public body on the contract "became and was his own money—money which he had legally earned, and which belonged to him alone —just as much as any other money he could have" (102 *N. J. Eq.,* at *p.* 420). Therefore he could do with it as he pleased and neither he nor his creditor was bound to use or apply it in any particular way. Neither the municipal mechanics' lien law nor the obligation on the contractor created by the bond act required "either the contractor or the contractor's creditors to make such primary application of moneys received by the contractor on his contract—nothing either expressed or arising by necessary implication." (102 *N. J. Eq.,* at *p.* 420.) The court pointed out that it might not be unfair to contractors and sureties, in view of the favored treatment accorded laborers and materialmen by the statutes, for the Legislature to require that all payments received out of moneys

paid by a public agency municipality on a particular contract be applied to the liquidation of claims arising out of that contract, but that the Legislature had not done this so far. Consequently, despite the creditor's knowledge of the source of the payment, no equity arose in favor of the surety in *Grover* (or the analogous prime contractor in *Standard Oil*) which would overcome a creditor's legal right, under the payment application rules, to select the allocation of a payment when his debtor fails to do so.

As we have said, *Grover* and *Standard Oil* represent one of two sharply conflicting lines of authority where the payment application rules clash with the interests of third parties. The views are as divergent today as when these cases were decided. The cases supporting each view are collected in Annots. 41 *A. L. R.* 1297 (1926); 130 *A. L. R.* 198 (1941); 166 *A. L. R.* 641 (1947); 57 *A. L. R. 2d* 855, 872 (1958) and 6 *Williston, Contracts* §§ 1804–1806 (*rev. ed.* 1938), where the author discusses all aspects of the problem. And see a comprehensive consideration of the question in particular relation to building construction cases in Note, "Equities of Third Parties Affecting Application of Payments," 83 *U. Pa. L. Rev.* 898 (1935).

The jurisdictions reaching a result contrary to the *Grover* line of authority generally do so upon elemental considerations of justice or upon an implied contractual obligation to the prime contractor and his surety, resulting in equities which override the payment application rules. Representative cases are *R. P. Farnsworth & Co. v. Electrical Supply Co.*, 112 *F. 2d* 150, 130 *A. L. R.* 192, reh. den. 113 *F. 2d* 111, 130 *A. L. R.* 197 (5 *Cir.*, 1940), *cert.* den. 311 *U. S.* 700, 61 *S. Ct.* 139, 85 *L. Ed.* 454 (1940); *United States use of Carroll v. Beck*, 151 *F. 2d* 964, 166 *A. L. R.* 637 (6 *Cir.* 1945); and *St. Paul Fire and Marine Insurance Co. v. United States*, 309 *F. 2d* 22 (8 *Cir.* 1962). As one court put it: "* * * the law will make the credit according to principles of justice and equity. It will not permit the money of one man to be used in the payment of the debt of another

man, or declare a lien on the property of the man who has paid in full for all the material furnished to improve his property." *Williams v. Willingham-Tift Lumber Co.*, 5 *Ga. App.* 533, 536, 63 *S. E.* 584, 585 (*Ct. App.* 1909). At least one state reaches the same result by easily finding an estoppel against the assertion of a lien by the materialman. *E. g., Dickerson Lumber Co. v. Herson*, 230 *Md.* 487, 187 *A.* 2d 689 (*Ct. App.* 1963). Several protect the owner or the contractor and his surety even where the materialman did not know the source of the money he received, *e. g., Sioux City Foundry & Mfg. Co. v. Mertens*, 174 *Iowa* 332, 156 *N. W.* 367, *L. R. A.* 1916D, 1247 (*Sup. Ct.* 1916).

The *Restatement*, published after *Grover*, somewhat tempers the rigid right of debtor and creditor to apply payments without regard to the interests of third parties and makes some accommodation to the natural feeling of injustice which gave rise to the contrary line of authority. *Restatement, Contracts* §§ 387–394, inc. (1932). See also *Restatement, Security* § 142 (1941). The position taken is generally that espoused by the leading text writers. 6 *Williston, Contracts* §§ 1795–1806, inc. (*rev. ed.* 1938); 5 *Corbin, Contracts* § 1231 (1951). While recognizing the basic rules, see section 387, the debtor's power to control the application is limited by section 388 in this language: "If the payor is under a duty to a third person to devote money paid by him to the discharge of a particular debt the payment must be so applied if the creditor knows, or has reason to know, of the payor's duty, in spite of the fact that the payor directs that the payment shall be applied to the discharge of another debt." The creditor's power, when the debtor gives no direction, is similarly limited by section 389 (e): "* * * the creditor cannot apply the payment * * * to the exclusion of a claim, failure to discharge which, with the money then paid, will, as the creditor knows or has reason to know, violate a duty owed by the debtor to a third person, whether that duty arises from a fiduciary relation or from a contract." These limitations presuppose "that the debtor shall be under a

contract with the third person, not merely to pay a particular debt, but to devote to that debt the very money with which payment was made." Section 388, comment a. Under the *Grover* thesis that a contractor as to his surety (or a subcontractor as to the prime contractor) had no such duty by virtue of the lien law or the bond act, these limiting provisions of the *Restatement* alone would not point to a different result in that case. See section 387, illustration 10 and section 388, illustration 2. *Cf.* section 389, illustration 5.

Moreover, it is noteworthy that when it comes to governing principles where neither debtor nor creditor has allocated, the *Restatement* takes a broader view. Section 387(c), speaking generally, says that then a payment is applied "as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied." Section 394(1) states more particularly that the payment is to be applied "to the earliest matured debt to which the creditor might have applied it, except that application is made to (a) a matured debt which the debtor is under a duty to a third person immediately to pay, rather than to one where he is under no such duty; * * *" Comment b explains: "* * * in one situation [a payment] will not be applied in a manner favorable to [the creditor], though had he exercised his power of application, it could have been so applied. Thus, Subsection (1a) covers all cases of payments made by a principal debtor, whether his duty to the surety requires the particular money with which payment is made to be used in exonerating the surety or is merely a general one to apply some money to that object. The limitation stated in this Clause is made for the reasonable protection not only of third persons, but to protect the debtor himself from unintentionally violating a duty to them. Even though the money with which payment is made is not the subject of a trust or contract, the debtor's duty of exoneration has matured and his failure to exonerate would be a violation of duty." Thus the opposite result is reached in the *Grover* situation, see section 394, illustration 3, in which, as previously noted, the material-

man's own application would be upheld. And, as the illustration points out, the third party would be protected by the court even though the creditor did not know when he received the payment of the source from which it was derived.

One may well quizzically view the *Restatement* distinction between principles governing debtor or creditor application and those to be utilized by a court when neither party has allocated. Aside from the exception limiting the right of debtor and creditor where the payor is under a known contractual or fiduciary duty to a third party to apply the very money in a particular way, the principles do generally represent the present law of New Jersey. Our cases have frequently said that the right of appropriation by the parties is unlimited and unqualified, and not impaired by the effect on the rights of third persons, whose equities will be allowed any influence only when the court is called upon to make the application. See *e. g., State v. Sooy,* 39 *N. J. L.* 539, 546 (*Sup. Ct.* 1877), affirmed 41 *N. J. L.* 394 (*E. & A.* 1879). And the court in *Grover* perhaps may be said to have brought into our law the duty limitation on the debtor-creditor power, though unable to find the requisite obligation under the facts in that case. The reason for the wider view when a court is called upon to allocate was expressed this way in an early case: "* * * the law intends that all men shall be honest, and fully perform their just obligations. The court, therefore, in making the appropriation, does that which an honest man would do." *Leeds v. Gifford,* 41 *N. J. Eq.* 464, 469 (*Ch.* 1886), affirmed o. b. 45 *N. J. Eq.* 245 (*E. & A.* 1888). It is a little difficult to understand why, if what a court is called upon to do is the only right and honest thing, the parties themselves should not be held in their own conduct to the same standard of elementary morality.

Therefore, were we called upon to decide the *Grover* situation as a matter of first impression, we might well consider going the other way, notwithstanding the *Restatement* and despite the fact that there the third party who was, in effect, called upon to pay twice, was a surety which voluntarily ac-

cepted a risk for compensation. It must not be lost sight of that in *Grover,* as here, it was to the distinct financial advantage of *both* debtor and creditor to apply the payment as it was and that the creditor had full knowledge of its source and certainly appreciation of how, in common honesty, it should be allocated. But we need not go so far in the instant case as to overrule *Grover* or quarrel too much with the *Restatement,* because subsequent legislation has nullified *Grover's* precedential force and indicated a duty falling within the *Restatement* exception.

We refer to the trust fund act, *L.* 1932, *c.* 268, which now reads, *N. J. S.* 2A:44-148:

"All money paid by the state of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the state, shall constitute a trust fund in the hands of such person as such contractor, until all · claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid."

A companion act, adopted the same day, *L.* 1932, *c.* 269, now *N. J. S.* 2A:102-12 and since supplemented by *L.* 1959, *c.* 98, *N. J. S.* 2A:102-12.1, makes it a misdemeanor for a contractor to use any of the moneys so received for other than the designated purposes.[3] The statement appended to the civil

---

[3] Earlier the same year the Legislature enacted *L.* 1932, *c.* 104, now *N. J. S.* 2A:102-9, 10 and 11. The latter two sections were later amended by *L.* 1954, *c.* 123 and all three supplemented by *L.* 1959, *c.* 98, *N. J. S.* 2A:102-12.1. This statute, introduced by a different legislator than chapters 268 and 269, had reference only to private construction projects and, on its face, is entirely criminal in impact. As far as pertinent for present purposes, it declared that all moneys received by a contractor from any owner or mortgagee of lands upon which a building is being erected, or by a subcontractor from such owner or mortgagee or from a contractor, are trust funds in the hands of the payee to be applied to the amount due or to become due from the contractor or subcontractor, as the case may be, to all persons furnishing labor or material to the payee for the construction and made it a misdemeanor for the payee to appropriate

statute set forth its purpose as the protection of materialmen and laborers by making all funds paid by the public agency to the prime contractor "trust funds in the hands of the contractor for the benefit of laborers and materialmen."

While the statute is cryptic and does not spell out the intended incidents and consequences of the trust created, it does sufficiently evidence legislative intent that a duty should exist throughout the contractual chain, requiring the parties to apply payments only for purposes of the project, at least where the recipient knows the source of the funds. It appears to be an obligation which should be as much encompassed within the limitations on the right of payment application by a debtor or creditor specified in *Restatement, Contracts* §§ 388 and 389 (e) as that similarly found to arise out of the facts in *St. Paul Fire and Marine Insurance Co. v. United States, supra,* 309 *F.* 2d 22.

The act has had little judicial interpretation, and none in the present context. In fact, the precise question in *Grover* does not appear again to have come before our appellate courts since the statute was passed. It was referred to in two cases where the money remained in the hands of the prime contractor and distribution in the manner found proper by the court under the particular facts was ordered in actions on behalf of the contractor's surety for exoneration *quia timet. Stulz-Sickles Co. v. Fredburn Construction Corp.,* 114 *N. J. Eq.* 475 *(Ch.* 1933) ; *Fidelity and Deposit Company of Maryland v. McClintic-Marshall Corp., supra,* 115 *N. J. Eq.* 470, affirmed 117 *N. J. Eq.* 440. But this right of exoneration existed at common law. 4 *Pomeroy, Equity Jurisprudence* § 1417 (*5th ed.* 1941). Stulz-Sickles said as much and com-

---

such funds for any other purpose prior to the payment of such claims. The statement annexed to the bill stated that its purpose was "to protect labor sub-contractors and materialmen who have done work or supplied material on a job by making it a criminal offense to use money advanced * * * for any purpose except in payment for the labor or materials until they are all paid for." As to civil liability arising by virtue of the statute, see *Samuel D. Wasserman, Inc. v. Klahre,* 24 *N. J. Super.* 143 (*App. Div.* 1952).

mented that the most notable feature of the trust fund act was to insure that very exoneration. 114 *N. J. Eq.*, at *pp.* 478–479. And in another case, the court said contract payments deposited by a prime contractor in his general bank account were, as to the bank which satisfied his loan obligation therefrom prior to his insolvency, free of the statutory trust, at least where the bank could not be said to have had notice of their origin and character. *American Lumberman's Mutual Casualty Company of Illinois v. Bradley Construction Co.*, 127 *N. J. Eq.* 500 (*Ch.* 1940), affirmed 129 *N. J. Eq.* 278 (*E. & A.* 1941).

The courts in these cases rather generally discussed the intended effect of the statute. Not being faced with the problem before us, the comments are not definitive. While *American Lumberman's* spoke of the intent as charging moneys with a trust only so long as they remain in the contractor's hands, both it and *Stulz-Sickles* indicated belief that the statutory purpose was to avoid the effect of *Grover*. Since there the contractor had already paid the materialman and the latter was allowed to collect his bill again, the statute, to overcome that decision, would have to mean that the moneys retained their trust character in the hands of the materialman who had knowledge of their source (even though perhaps not in the hands of a stranger with such knowledge). We think that the Legislature certainly intended that effect. Anything less would make the enactment of little value. That being so, where the prime contractor's payee is a subcontractor owing a materialman for goods used in the work, he ought, in good conscience, use enough of the payment to satisfy that charge and the materialman-recipient, with knowledge of the source, should be bound to allocate it accordingly. He suffers no legitimate loss by so doing and gains no windfall at the expense of another. While it cannot be said that the trust fund act prescribes a full-blown trust relationship all the way down the ladder with consequent effect upon strangers to the construction project, the underlying thought is clear that all

those directly involved should do the right and honorable thing.[4]

A court should not hesitate to translate that legislative conception into a positive duty and to compel the appropriate use of payments where the payee knows their source and obviously intended purpose. (We do not suggest that a party below the direct payee of the prime contractor has a duty to inquire or that he is bound even where he has no knowledge, but reason to know and circumstantial information may be as effective as that which is direct.) For a court to do less would be to sanction sharp practice—indeed unmoral conduct —in the business community. That day should have long since passed as far as the judiciary is concerned.

Atlantic urges, however, that Hiller should not have relief because it could have protected itself against Atlantic's present lien claim when it paid Universal, it then knowing that Universal owed Atlantic for the materials used. Atlantic suggests Hiller could have required an affidavit of debts to materialmen, directed Universal to pay Atlantic or have made the payment jointly to Universal and Atlantic or directly to Atlantic. While undoubtedly a prime contractor who is a

---

[4] Trust fund statutes of other states are generally construed to give rise to criminal liability only, principally because such is the sole intended thrust of the legislation. See *e. g.*, *Standard Oil Co. v. Day*, *supra*, 161 *Minn.* 281, 201 *N. W.*, at *p.* 413; *Club Holding Co. v. Flint Citizens' Loan & Investment Co.*, 272 *Mich.* 66, 261 *N. W.* 133 (*Sup. Ct.* 1935). Any civil benefit would presumably come about by reason of the criminal penalty acting as a deterrent. A civil obligation as well does appear to have been found, however, in *Maull v. Stokes*, 31 *Del. Ch.* 188, 68 *A.* 2d 200 (*Ch.* 1949).

Atlantic suggests in effect that the view of our trust fund act we have taken above runs counter to that of the federal courts in applying New Jersey law in *First Camden National Bank & Trust Co. v. Aetna Casualty & Surety Co.*, 43 *F. Supp.* 596 (*D. N. J.* 1942), affirmed 132 *F.* 2d 114 (3 *Cir.* 1942), cert. den. 319 *U. S.* 749, 87 *L. Ed.* 1704, 63 *S. Ct.* 1157 (1943). We cannot agree. There the court followed *Grover* as the law of this State, but the Court of Appeals did not mention the statute and the District Court said that the statute had amended *Grover* but it was immaterial in the case. 43 *F. Supp.*, at *p.* 601.

surety for his subcontractor may take steps in the nature of exoneration to safeguard himself from such liability, see *Fidelity and Deposit Company of Maryland v. McClintic-Marshall Corp., supra,* 115 *N. J. Eq.,* at 475, and runs a risk if he does not and other principles are insufficient to protect him, we do not think these circumstances should control. The law ought to be based on people, especially those regularly engaged in business, doing the proper and conscionable thing. Those acting properly and in good faith should not be penalized through technical considerations where the party who urges the bar is guilty of conscienceless conduct. The evidence in this case was uncontradicted that in the construction industry, business is customarily done on credit—the promises the industry lives by. The prime contractor expects to pay his subcontractor from installment payments received from the owner and the materialman depends on the subcontractor to make payment out of the money the latter has received. Each party in the chain fully realizes what business practice requires of him and business stability depends on conformity even when the going becomes rough. The law should be framed accordingly.

Little more need be said as to the application to the current facts of the principles we have outlined. The $5,000 payment did not come from Hiller's payment to Universal but out of the latter's earnings on another job, so what we have said cannot affect Atlantic's allocation of that sum to the prior indebtedness in accordance with the "on a/c" notation which the check bore. Atlantic, of course, has never received the $2,393.30 balance of the charge for the Hiller job materials. But the original $15,000 payment clearly falls within all the equitable principles mentioned, of which Atlantic must be held to be cognizant, provided Atlantic had knowledge of the source. If that be so, Atlantic was required to apply it to the Hiller job. And this result would follow even if Universal had directed application of the sum otherwise.

The Appellate Division stated, 73 *N. J. Super.,* at *p.* 232, "that Atlantic knew that the $15,000 was paid from funds

received from plaintiff." We think this conclusion is unquestionably correct. The testimony of Universal's representatives at the conference, held a few days after the $15,000 was paid, was that when Universal ordered the materials it was agreed they were to be paid for in full when Universal was paid by Hiller and that Atlantic's officers attending the conference demanded to know what had happened to the balance of the Hiller payment, since they knew Universal had been paid in full, and why Atlantic had not received the entire amount of its bill. This testimony has the ring of truth, coming as it does from the mouths of representatives of an impecunious corporation, which, practically, had nothing to gain from the outcome of the litigation. It is not overcome by the denials thereof on the part of Atlantic's witnesses or by their statements that the Hiller job was not even discussed or the source of the $15,000 payment mentioned. Such testimony is incredible in itself, *In re Perrone*, 5 *N. J.* 514 (1950), as well as inconsistent with other statements of the same witnesses as to what transpired at the conference. These need not be detailed except to say that it is perfectly obvious, on the basis of the balance figures they testified to as well as how this remaining sum was to be paid from the proceeds of other jobs, that Atlantic had decided to apply the $15,000 to the antecedent debt and file a lien claim for the full amount of the Hiller bill. Otherwise the balance figures mentioned make no sense and the agreement reached as to future payment thereof would be practically impossible of fulfillment. Atlantic's story that it believed Universal had not yet received anything from Hiller and that it would be paid the $22,393.30 when Hiller did make payment is unworthy of belief, since it did not communicate with Hiller to verify its belief or to make certain its money would be thereby received, although fully aware of Universal's precarious financial condition.

There remains the question of whether Atlantic's lien claim should be disallowed *in toto* because it was filed for the full amount of $22,393.30 when, as matters turnout, it is only entitled to $7,393.30 thereon. It will be recalled that the trial

court discharged the lien in its entirety under the doctrine that it was completely void because filed for a grossly excessive amount, citing *James Radcliffe & Sons Co. v. Hawthorne*, 109 *N. J. Eq.* 309 (*Ch.* 1931), affirmed o. b. *sub. nom. James Radcliffe & Sons Co. v. Knoble*, 112 *N. J. Eq.* 90 (*E. & A.* 1933). Hiller does not press the point here, which in itself is enough warrant for us to disregard the issue. But, in any event, we think the doctrine should not be applied in the present circumstances. The matter of the application of the $15,000 payment was primarily a legal and not a factual question, and a somewhat novel one at that. Atlantic at least had some justification for its position by reason of the decision in *Grover*. Although we have found that position was erroneous, it would be inequitable to declare a forfeiture because it was asserted.

The result is that Atlantic is entitled to a lien in the amount of $7,393.30 against the contract price. The judgment entered in the trial court in its favor against Universal for the balance of the total indebtedness should be reduced accordingly and Hiller is entitled to a judgment against Universal for the amount of the lien as so allowed.

The judgment of the Appellate Division is therefore modified and the cause remanded to the Chancery Division for the entry of the judgments specified above. Costs to Hiller.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.