166 N.J. Super. 172 (1979)
399 A.2d 324
HOUDAILLE CONSTRUCTION MATERIALS, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
AMERICAN TELEPHONE & TELEGRAPH COMPANY, A NEW YORK CORPORATION, AND TURNER CONSTRUCTION COMPANY, A NEW YORK CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 29, 1979.
*174 Mr. Clifford W. Starrett for plaintiff (Messrs. Schenck, Price, Smith & King, attorneys).
Mr. Daniel J. Matyola for defendants (Messrs. Wharton, Stewart & Davis, attorneys).
McELROY, J.S.C.
On May 15, 1974 defendant American Telephone & Telegraph Company (AT&T) entered into a contract with defendant Turner Construction Company (Turner) for the latter to act as construction manager for the Long Lines Headquarters building complex to be built on property owned by AT&T in Bedminster Township, New Jersey. On June 20, 1974 Turner entered into a contract with Barnaby Concrete Company (Barnaby) for the latter to act as contractor on a portion of the AT&T construction *175 project specifically relating to the cast-in-place concrete work. Both of the above contracts referred to and incorporated by reference certain general contract conditions.
Prior to awarding the contract to Barnaby, Turner reviewed the qualifications of several proposed bidders, including Barnaby, and concluded, on the basis of prior experience with Barnaby, a review of Dun and Bradstreet reports and other information, that Barnaby was qualified to bid on this particular project.
Plaintiff Houdaille Construction Materials, Inc. (Houdaille) is a supplier of concrete. Before plaintiff began supplying concrete to Barnaby at the AT&T site, plaintiff through Mr. Zamrock, its senior vice-president, approved granting credit to Barnaby on the AT&T job. There was no upper limit on this credit, either in terms of dollar amount or in the time between delivery of the concrete and payment for said delivery. This grant of credit was based upon experience with Barnaby over a number of years, involving at least three construction projects.
Houdaille issued a series of price quotations to Barnaby with respect to this construction project. These quotations became the basis of the contractual relationship between Houdaille and Barnaby. When a shipment of concrete was necessary Barnaby would call Houdaille to relate the amount and type of concrete needed and a delivery ticket would be given to Barnaby's representative at the time of delivery.
At the end of every month Houdaille would issue invoices to Barnaby for the concrete delivered during that month. The invoices recited that they were payable within 30 days. Houdaille, however, did not expect payment within that period of time. Houdaille had a long-standing relationship with Barnaby under which Barnaby would pay Houdaille $75,000 to $100,000 a month without regard to the amount of concrete delivered during the previous month.
During the period of time relevant to this litigation Houdaille never saw any of the contract agreements between AT&T, Turner and Barnaby, nor was Houdaille ever advised *176 by either AT&T or Turner that any funds were being retained from the periodic payments being made to Barnaby. Houdaille had no idea of the amount of retainage, if any, until some time in May 1976.
The AT&T-Turner-Barnaby contracts called for periodic progress payments to be made to the contractor based upon the percentage of work which had been completed to date. The procedure was that the contractor would submit an application to Turner based upon the amount of work completed during the applicable month. Turner would review the application and pass it on to AT&T together with applications received from other contractors. After all the applications were reviewed and approved or modified as necessary, AT&T would issue one check to Turner, who would then disburse the funds among the contractors as indicated on the various applications for payment.
Each application was accompanied by a document entitled "Affidavit-Waiver and/or Release of Lien," which related to the payment received for the previous month's application. Each of the affidavits contained, in paragraph 5, a statement that the contractor waives and releases all liens and claims against AT&T and, in paragraph 3, that all laborers, subcontractors, materialmen and suppliers, "including but not limited to those listed in Exhibit A attached to and made a part hereof," have either been paid or have waived or released any and all claims against AT&T, and that no person or party other than the contractor has any claim or right to a lien on account of the work done.
Initially, some attempt was made to obtain the Exhibits A referred to in the affidavit but because of the number of contractors, subcontractors and suppliers involved, that process became too cumbersome, and Turner and AT&T agreed to discontinue the use of Exhibit A. The use of Exhibit A was reinstituted, to some extent, after the Barnaby-Houdaille problem erupted in April and May of 1976.
Paragraph 9.3.5 of the General Conditions of the contract provided:

*177 [W]ith each application for payment, the Contractor must submit a waiver of lien against the work for which he was paid under the previous application for payment, such waivers being required for all obligations detailed on his previous application for payment including the Contractor's own work, the work of his Subcontractors, and material furnished by his suppliers.
Paragraph 9.4.1 of the General Conditions provided that after the applications for payment have been approved by the construction manager and the owner, the construction manager will pay to the contractor those amounts deemed properly due within the period specified. Paragraph 9.4.2 goes on to state that "by issuing a certificate for payment, the Construction Manager shall not thereby be deemed to represent that he has made any examination to ascertain how or for what purpose the Contractor has used the monies previously paid on account of the contract sum." No other provision of the contract between Turner and AT&T or of the General Conditions requires the construction manager to make any inquiry as to the use to which a contractor puts the funds paid to him or to determine that all materialmen and suppliers have been paid.
Paragraph 2 of Article XVII of the AT&T-Turner contract provides that
* * * All money paid by the Owner under Article XXIV hereof to Construction Manager shall constitute a trust fund in the hands of Construction Manager. In disbursing said monies, Construction Manager shall apply the same strictly to the purpose of paying for labor, materials, and other charges reflected in the applications for progress payments submitted under said Article XXIV and to no other purpose whatsoever. It is understood and agreed as a material condition of this Agreement that Construction Manager shall have a continuing duty to keep said property free and clear of all liens, claims and encumbrances arising from the doing of the work. * * *
Article X of the contract provided that "[n]othing contained herein shall be deemed to create any contractual relationship between the Construction Manager and the Architect, nor shall anything contained herein be deemed *178 to give any third party any claim or right of action against the Owner or the Construction Manager." It is also provided in paragraph 1(a) of Article XXIV of the contract that applications shall be submitted monthly and "shall be in form and detail acceptable to the Owner covering those portions of the Construction Cost for work completed during the previous month and shall have attached such waivers of lien and affidavits as the Owner may require." The affidavits obtained by Turner from Barnaby with each application were on the forms prescribed by AT&T, and AT&T concurred in the decision to not insist on the incorporation of Exhibt A into said affidavits except for the initial period.
From each progress payment 10% of the total amount was retained as security for the proper completion of the job. On September 11, 1975 the retainage on the Barnaby contract was reduced from 10% to 5% and approximately $309,000 was paid over to Barnaby at that time. A second reduction of reserve to a fixed sum of $50,000 took place on March 17, 1976 when approximately $258,000 was released to Barnaby.
The first delivery of concrete to the AT&T project occurred in July 1974 and the first Houdaille invoice to Barnaby was issued on July 31, 1974.
Late in 1975 or early 1976 Barnaby approached Houdaille and requested that it not bring the status of Barnaby's account with Houdaille to the attention of either AT&T or Turner because Barnaby was then in the process of negotiating a new contract with Turner concerning another project. At a meeting which was held in January 1976, Houdaille agreed that it would not voluntarily release any information to AT&T or Turner concerning the Barnaby account because Barnaby was a valued customer of Houdaille. Up to this point Turner had made no inquiry of plaintiff as to the status of the Barnaby account.
On April 5, 1976 Barnaby requested that Turner release the payment for April approximately two weeks early for the specific purpose of permitting Barnaby to make a payment *179 to Houdaille. The $125,000 released did in fact reach Houdaille and was credited against Barnaby's account. On April 22, 1976 Turner became aware that Barnaby was delinquent in its payments to the Ironworker's Fund. Turner's project supervisor, Robert Fee, called O.P. Jack, a Houdaille salesman, on the same day but was advised that the Houdaille-Barnaby account was current.
On April 24, 1976 Mr. Knight, plaintiff's sales manager, met with representatives of Turner to inform them that Barnaby's account with Houdaille was in fact delinquent. On April 27, 1976 a meeting was held at the job site and the magnitude of Barnaby's debt to Houdaille, approximately $376,000, was disclosed to Turner. At a subsequent meeting in May 1976, Houdaille was advised that Turner and AT&T would not reimburse Houdaille for the amount it had advanced to Barnaby and Houdaille ceased deliveries to the AT&T project.
After Houdaille ceased deliveries to the project site, Turner obtained another contractor to supply the necessary concrete for the balance of the work. Ultimately, it became necessary for Turner to discharge Barnaby completely and to take over completion of the work itself.
Houdaille brings suit for the loss it sustained when Barnaby became insolvent and failed in payment. AT&T and Turner counterclaim for damages incurred by them in completing Barnaby's obligations under the contract. Plaintiff seeks judgment for $415,921.72. Defendant asserts a loss of $372,000. The matter was heard without a jury.

I. As to Plaintiff's Claim

Plaintiff first asserts that the "trust fund" provision (paragraph 2 of Article XVII) of the contract must be viewed as creating a trust for the benefit of plaintiff as a materialman or supplier. The argument here advanced is somewhat similar to a third-party beneficiary approach also urged by plaintiff, but has its root in an attempt to make *180 analogy to the Public Trust Fund Act, N.J.S.A. 2A:44-148[1]
Plaintiff acknowledges that this construction project was in the private sector and could not be governed by the Trust Fund Act which concerns itself solely with public ventures. Rather, plaintiff asserts that the language used by defendant in Article XVII so parallels that used in N.J.S.A. 2A:44-148 as to evince an intent upon the part of defendants to make the trust fund dictated by the contract one designed to benefit plaintiff. In pertinent part the statute provides that:
All money paid by [a public entity] to any person pursuant to the provisions of any contract for any public improvement made between any such person and the [public entity], shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid.
Article XVII of the contract herein provides:
2. All money paid by the Owner under Article XXIV hereof to the Construction Manager shall constitute a trust fund in the hands of the Construction Manager. In disbursing said monies, Construction Manager shall apply the same strictly for the purpose of paying for labor, materials and other charges reflected in the applications for progress payments submitted under Article XXIV and to no other purpose whatsoever.
Plaintiff urges that the contract language and the statutory phrasing is so strikingly alike as to indicate, on AT&T's part, "a familiarity with the provisions of the Trust Fund Act" and a clear intent to emulate that act's intention to protect and secure payment to materialmen and suppliers.
While the Trust Fund Act has been interpreted as giving to a supplier the benefit of the trust fund it creates, *181 this is not so against a prime contractor in a circumstance where the supplier's relationship is remote from the prime contractor. A recent appellate expression of this view is to be found in Universal Supply Co. v. Martell Constr. Co., Inc., 156 N.J. Super. 327 (App. Div. 1978). In Hiller & Skoglund, Inc. v. Atlantic Creosoting Co., Inc., 40 N.J. 6, 21 (1963), Justice Hall noted that while the act "is cryptic and does not spell out the intended incidents and consequences of the trust created, it does sufficiently evidence legislative intent that a duty should exist throughout the contractual chain, requiring the parties to apply payments only for the purposes of the project...."
This concept, that by statutory direction, the trust duty descends the contractual chain is a recognition of the act as an embodiment of basic commercial precepts. The evidence in this case is that Turner relied on AT&T for payment, Barnaby placed the same reliance on Turner and plaintiff in turn looked to Barnaby to pay it from payments made by Turner. Plaintiff in fact extended large amounts of credit to Barnaby for months at a time, looking only for part payment as evidence of good faith by Barnaby. Upon similar evidence Justice Hall, in Hiller, noted:
* * * The evidence in this case was uncontradicted that in the construction industry, business is customarily done on credit  the promises the industry lives by. The prime contractor expects to pay his subcontractor from the installment payments received from the owner and the materialman depends on the subcontractor to make payment out of the money the latter has received. Each party in the chain fully realizes what business practice requires of him and business stability depends on conformity even when the going becomes rough. The law should be framed accordingly. [40 N.J. at 24]
Assuming, arguendo, that an analogy should be drawn between the instant contract language and that of the Trust Fund Act, plaintiff's argument is demonstrated to stand upon an unconvincing base and is rejected. The act in question would not make a public prime contractor liable to one *182 in plaintiff's position as supplier to a subcontractor when the prime contractor has, as Turner has, applied the project funds to payment of its subcontractor. In Universal Supply Co. v. Martell Constr. Co., Inc., supra, the court leaves no room for doubt. Judge Larner states:
As long as the prime contractor, Martell, paid in full all the materialmen and subcontractors who were in a direct contractual relationship with it, Martell fulfilled its trust obligations under the Trust Fund Act and had no legal duty to satisfy a claimant who furnished materials to Martell's subcontractor. [156 N.J. Super. at 333][2]
Likewise, where this contract makes monies in the hands of Turner trust funds to pay "labor, materials and other charges" reflected in Barnaby's application for payment (submitted under Article XXIV), payment by Turner to Barnaby discharges Turner's contractual fiduciary duty. Barnaby's application and its accompanying affidavit stated that its suppliers were paid. Turner, in reliance upon such declaration, applied AT&T's funds to the project by paying Barnaby. Neither the contract nor the course of conduct *183 of AT&T and Turner pursuant to the contract demonstrate any fiduciary obligation on Turner's part to seek out plaintiff to ascertain if in fact payments were current. When I consider that, insofar as plaintiff was concerned, a payment by Barnaby of not what was actually due but a part payment on account was acceptable, I doubt that any such inquiry would have been worthwhile. This view finds much support in plaintiff's later willingness to agree with Barnaby that plaintiff would not disclose to Turner the delinquent state of Barnaby's account.
This court cannot, moreover, ignore plaintiff's own actions. Plaintiff followed the usual industry practice alluded to by Justice Hall in Hiller. Plaintiff's conduct gives no evidence of reliance for payment upon anyone but Barnaby, its immediate contractor. Its habitual and generous extension of enormous amounts of credit to Barnaby over months at a time placed plaintiff in the unfortunate position it now regrets. There is in this matter no consideration of public policy or interest such as could or should impel this court to impose a trust in behalf of a plaintiff whose own action places it in this unhappy financial plight.
The clear purpose of Article XVII in creating the trust funds of monies in the hands of Turner is to protect AT&T by requiring that Turner use the funds "strictly" for the purposes of the project and for "no other purpose whatsoever." Its main purpose is to insure that Turner will not use the funds to pay itself but will pay its contractors and thereby prevent harassment of the owner's project by liens. It is designed to protect and secure the owner and not to benefit, except perhaps in most incidental fashion, a subcontractor's supplier of materials. Thus, in paragraph 1 of Article XVII of the contract, Turner waived any lien it might have, in paragraph 2 agreed to keep the property free of other liens and in paragraph 3 agreed to indemnify the owner from all claims "arising out of labor and materials furnished by" Turner "or its Contractors." Emphasis supplied. Viewed as a whole, Article XVII demonstrates *184 that the owner, not the plaintiff, is the intended beneficiary of the imposed trust.
In determining the intent of the parties in relation to the ambit of the trust obligations imposed contractually upon defendant Turner, this court cannot ignore a clear expression by AT&T and Turner in Article X which demonstrates that neither defendant intended to subject itself to the liabilities here asserted by plaintiff. That article reads:

ARTICLE X
Relationship Between Construction Manager and Others
Nothing contained herein shall be deemed to create any contractual relationship between the Construction Manager and the Architect, nor shall anything contained herein be deemed to give any third party any claim or right of action against the Owner or the Construction Manager. [Emphasis supplied].
Plaintiff asserts that this declaration of intent by the contracting parties "is insufficient to delete the equitable right of the plaintiff to enforce the trust fund created for its benefit." Plaintiff here relies upon National Surety Corp. v. Barth, 11 N.J. 506 (1953), and Goodwillie v. Bayonne, 2 N.J. 88 (1949). Plaintiff argues that where, as here, the contract establishing the trust does not expressly identify the beneficiaries, analysis is often made in terms of third-party beneficiary law. Plaintiff's approach here is correct but fails because, as already determined, the contract in general, the conduct of the parties, the trust article and Article X do not give plaintiff any position other than that of an incidental beneficiary.
Plaintiff cites N.J.S.A. 2A:15-2, which provides:
A person for whose benefit a contract is made, either simple or sealed, may sue thereon in any court and may use such contract as a matter of defense in an action against him although the consideration of the contract did not move from him.
This statute "is merely declaratory of the previously existing rules established by numerous decisions" which dealt *185 with rights of contractual third party beneficiaries. It obviates the need for privity of contract. Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73, 76 (E. & A. 1939).
Whether we attempt to label the contractual undertaking here imposed by AT&T an equitable trust (Barth and Goodwillie, supra) or a third party beneficiary obligation, the principles which govern either approach are basically the same. Essential to either view of the matter is a determination that the obligation have as its purpose a benefit intended by the contracting parties to be of greater force than mere incidental effect. Brooklawn, supra; Gold Mills, Inc. v. Orbit Processing Corp., 121 N.J. Super. 370, 373 (Law Div. 1972); Moorestown Mgmt., Inc. v. Moorestown Bookshop, 104 N.J. Super. 250, 258 (Ch. Div. 1969). Brooklawn lists the classes of such beneficiaries and clearly delineates those who may enforce performance of the contract:
Third party beneficiaries are generally classified as donee, creditor and incidental. The real purpose of this classification is to distinguish between the beneficiary who has a right of action under the contract, and one who has not. Thus, the incidental beneficiary might profit from the performance of the contract, but he cannot enforce such performance by legal action.
* * * It is not enough that the plaintiff may be benefited by the performance of the contract. He can only maintain the action when the contract is made for him * * *
The determining factor as to the rights of a third party beneficiary is the intention of the parties who actually made the contract. [124 N.J.L. at 76.]
For the above reasons, and those considered in the prior discussion of plaintiff's Trust Fund Act analogy, I find plaintiff's arguments as to an equitable trust or a third-party beneficiary approach to be without merit.
Plaintiff contends that the decision by defendants to discontinue use of the Exhibit A form initially required of contractors such as Barnaby was improper. Plaintiff contends that this form required each of Barnaby's suppliers to swear that he was being paid and that had AT&T and Turner *186 continued to insist on such affidavits plaintiff would not have sustained damage by reason of Barnaby's failure to pay plaintiff.
I have serious doubts about plaintiff's present assertion that use of this form would have had much effect on the resulting losses. Plaintiff was quite willing to treat Barnaby as an old and valued customer. The monthly partial payments of $75,000 to $100,000 were all that plaintiff sought of Barnaby, plaintiff relying on eventual complete payment.
There is yet another consideration. Defendants created the method of application for payment and clearly had the right to modify that method. Plaintiff is not shown to have relied, in any degree, on the continued use of this form. Exhibit A forms were to protect the defendants from claims and not to insure plaintiff's interests. The wisdom of the defendants' later waiver of the use of the form may be questionable, but plaintiff is not a beneficiary of the form's use nor of the contract except in most incidental effect, and gains thereby no right of enforcement. 1st Nat'l St. Bank, N.J. v. Carlyle House, Inc., 102 N.J. Super. 300, 322-323 (Ch. Div. 1968), aff'd o.b., 107 N.J. Super. 389 (App. Div. 1969).
Plaintiff next argues that this court should declare it to have a civil remedy as a trust beneficiary by reason of certain criminal statutes, citing N.J.S.A. 2A:102-10 and 102-11.[3]
Section 10 is entitled, "Misappropriation of funds paid to contractor for building purposes." Section 11 is entitled, "Misappropriation of funds paid to subcontractor for building purposes."
In pertinent part section 10 provides:
*187 All moneys received by a contractor from the owner of real estate * * * for the purpose of having a building erected * * * are trust funds in the hands of the contractor to be applied to the amount of all claims due or to become due and owing from the contractor to all person furnishing labor or materials to him for the erection * * * of the building * * * and any other reasonable and necessary change in connection therewith. [Emphasis supplied]
Section 11 contains the same language as § 10 except that it declares as to a subcontractor that monies paid to him by the owner are trust funds in his hands to be applied to the payment of persons who furnished labor and materials to him. Both sections declare a violator of their provisions to be guilty of a misdemeanor.
Plaintiff acknowledges that the cases of Samuel D. Wasserman, Inc. v. Klahre, 24 N.J. Super. 143 (App. Div. 1952) and Plevy v. Schaedel, 44 N.J. Super. 450 (Law Div. 1957), hold that § 10 does not give a civil right as a trust beneficiary. See also, Hiller & Skoglund, Inc. v. Atlantic Creosoting Co., Inc., supra, 40 N.J. at 20. Plaintiff argues that the weight of Wasserman and Plevy is undermined by the Circuit Court decision in Carrier Corp. v. J.E. Schecter Corp., 347 F.2d 153 (2d Cir.) cert. den. 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965). I cannot agree. In Carrier the court avoided the question here raised by plaintiff and on equitable principles declared a trust. That argument has already been considered by this court and, under the evidence in this case, found wanting in persuasive power.
These sections, moreover, demonstrate an interesting pattern which illustrates particular legislative intent and an apparent recognition by the Legislature of the practices of the construction industry discussed by Justice Hall in the Hiller case. Even if one were to assume a civil right emerging from these criminal statutes, the trust fund "in the hands of the contractor" could only benefit those who directly dealt with the contractor. Section 10 directs itself solely to claims "due and owing from the contractor to persons furnishing * * * materials to him * * *." (Emphasis supplied). The *188 statute imposes criminal penalty and must be strictly construed. Section 10, therefore, can hardly be viewed as applicable to benefit a materialman who supplied a subcontractor. Section 11 might, under the foregoing assumption, be viewed as giving plaintiff such right, but plaintiff is not looking for relief from Barnaby "the subcontractor."
I therefore find that plaintiff has failed under any of its arguments to establish rights maintainable against these defendants. The complaint is therefore dismissed and judgment as to that aspect of the case is entered in favor of defendants.

II. As to the Counterclaim

By way of counterclaim it is asserted that defendants incurred damages in that monies had to be expended in completing Barnaby's work under the contract. It is asserted that plaintiff knew Barnaby was in financial difficulties but failed to divulge that circumstance to Turner. Defendants contend that had plaintiff done so, Barnaby would not have been paid from funds retained by defendants under the contract and there would then have been money at hand to cover the cost overruns incurred in completing Barnaby's contractual obligations. Defendants assert plaintiff was guilty of wilful misrepresentation or concealment.
In support of their position defendants rely on St. Joseph Hospital v. Corbetta Const. Co., 21 Ill. App.3d 925, 316 N.E. 2d 51 (App. Ct. 1974). This case holds that in fraud cases based upon misrepresentation there is no prerequisite of privity in the traditional sense, provided the misrepresentation occurs with intent that plaintiff rely upon it, permit it to influence his action and, in fact, the plaintiff does rely upon it to his damage. Houdaille, on the other hand, insists that absent privity no duty of disclosure could arise in this case. Regardless of the question of privity, liability for fraud (here concealment), whether it be labeled legal or equitable, requires that there be an intent to deceive *189 and reliance by the party toward whom such conduct is directed. Such is not the instant case.
Plaintiff had an arrangement with Barnaby which preceded the AT&T project whereby plaintiff was content if Barnaby, while owing much more, would pay $75,000 to $100,000 on a monthly basis against the larger sums owed to plaintiff. This arrangement had gone on for a number of years. In this context it is apparent that until plaintiff and defendants became aware that Barnaby was in serious financial straits, plaintiff did not have reason to consider Barnaby as anything other than a slow paying but eventually reliable customer.
In January 1976 at Barnaby's request plaintiff instructed its salesmen that they should not volunteer any information to Turner concerning the status of Barnaby's account. It was agreed, however, that if defendants actually made inquiry, such information would be given to AT&T or Turner. Salesmen were to transmit such questions to higher echelon executives who were authorized to answer the inquiry. This was a business decision obviously motivated by a feeling on plaintiff's part that Barnaby's credit was good over the long run and the fact that he was purchasing and had purchased large quantities of concrete from plaintiff over a period of years. I do not find in this undertaking any evidence of intent on plaintiff's part to deceive defendants or to mislead them by failing to volunteer the facts of an arrangement which was a method of doing business that in the past had obviously worked out well financially for both plaintiff and Barnaby.
Turner did not make inquiry of plaintiff until April 22, 1976. On that date Robert Fee, Turner's general superintendent, received a call from a representative of a union disclosing that Barnaby was behind in pension fund payments. Concerned, Fee called plaintiff's salesman, O.P. Jack, who advised Fee that Barnaby's account was "current." Within a day or two of this conversation Mr. Knight, plaintiff's sales manager, met with Fee and advised him that *190 while Barnaby was delinquent in payments he was an old and valued customer over many years and that plaintiff did not wish Turner to "take any action" against Barnaby at that time. Knight requested Fee not to divulge to Barnaby Knight's disclosure of the account status. Fee did not do so. Three days later Knight again met with Fee and advised that the Barnaby account was approximately $375,000 in arrears.
I do not find in the evidence any rational basis for the conclusion that plaintiff wilfully misled defendants or concealed the state of Barnaby's account with intent to mislead these defendants. Plaintiff had no duty to disclose to others the state of its customer's account. Turner relied, if on anything, on the affidavits Barnaby filed each month stating that his suppliers were being paid, and apparently saw no reason to inquire until April 22, 1976. Within a day or two of such inquiry Turner was advised that the account was delinquent. Within a matter of days thereafter Turner was told the amount of money due. All parties gained knowledge of Barnaby's lack of good faith within the same brief span of time and, unfortunately, when it was too late to do much about it. Plaintiff up to that point in time may have been foolish to have extended so much credit to Barnaby (hind-sight makes this clear), but plaintiff acted in good faith and in reliance upon Barnaby's good faith, evidenced by payments under the same terms on this and other projects in the past years.
In view of the findings of fact made above I can see no reason to engage in discussion of whether, absent privity, a duty to disclose can arise. I find plaintiff's conduct under the circumstances reasonable and wholly lacking any intent to mislead, by silence, these defendants. I further find that defendants were not in any wise relying upon plaintiff for such disclosure. Whatever damage AT&T or Turner sustained was caused not by plaintiff but by defendants' reliance on Barnaby.
The counterclaim is dismissed.
NOTES
[1] The statute is incorrectly designated as 2A:44-147 in New Jersey Statutes Annotated.
[2] One collateral observation should perhaps be made. Universal Supply Co. and the Hiller & Skoglund cases are in no wise in any conflict. While Hiller, as plaintiff in its brief asserts, holds that the trust duty to apply payments only for the purposes of the project, "should exist throughout the contractual chain," and Universal would seem to cut off that duty at the area of the prime contractor, the cases, on analysis, hold to a common principle. The court in Universal did not have to decide whether, under trust principles, the plaintiff materialman could have recovered against the subcontractor whom it supplied (Monroe) since plaintiff voluntarily dismissed its suit against Monroe. Universal, like Hiller, does recognize that a materialman who supplies a subcontractor on a public project may have his remedy against the prime contractor and its surety under the Public Works Bond Act, N.J.S.A. 2A:44-143 to 147. There is no similar bond act in the private sector.

If one were to continue in plaintiff's analogy as to the Trust Fund Act and the contract terms presented in this case, adoption of the argument would, under Hiller and Universal, leave plaintiff to its "trust" remedy against Barnaby alone.
[3] While plaintiff also refers to N.J.S.A. 2A:102-9 and 12, the reference appears to be only casual or illustrative. Section 9 deals with the criminal liability of a mortgagor and section 12 deals with public funds. Neither section has any application to this case.