102 N.J. Super. 300 (1968)
246 A.2d 22
FIRST NATIONAL STATE BANK OF NEW JERSEY, A CORPORATION ORGANIZED UNDER THE BANKING LAWS OF THE UNITED STATES, PLAINTIFF,
v.
CARLYLE HOUSE, INC., A NEW JERSEY CORPORATION; MALIBU CONSTRUCTION CORP., A NEW JERSEY CORPORATION; FRANK KALISCH, MARVIN KALISCH, DAVID M. POTTS, DAVID SHARRON AND ARTHUR CASELLA, AS TRUSTEES UNDER AN INDENTURE OF TRUST DATED AS OF JANUARY 1, 1956 MADE BY E. KALISCH, INC., CREATING E. KALISCH, INC. EMPLOYEES' TRUST; E. KALISCH, INC., A CORPORATION OF THE STATE OF NEW YORK; JOSEPH SKALLER, AN INDIVIDUAL; SPENCER, WHITE & PRENTIS, INC., A NEW YORK CORPORATION; FRITZ CONTRACTING CO. INC., A NEW JERSEY CORPORATION; HELLER HARDWARE CO. INC., A NEW JERSEY CORPORATION; ARMOR ELEVATOR CO. INC., A NEW YORK CORPORATION; RITE KITCHENS, INC., A NEW YORK CORPORATION; OLIVER MANUFACTURING SUPPLY CO., A NEW JERSEY CORPORATION; WILLIAM H. HARRISON CONSTRUCTION CO. INC., A NEW JERSEY CORPORATION; STILLWELL SUPPLY CORPORATION OF NEW JERSEY, A NEW JERSEY CORPORATION; HERBERT SAND CO. INC., A NEW JERSEY CORPORATION; ACME PLASTERING CO. INC., A NEW JERSEY CORPORATION; J.P. PATTI COMPANY, INC., A NEW JERSEY CORPORATION; ARCTIC CONTRACTING CORP., A NEW YORK CORPORATION; ESSEX IRON WORKS, INC., A NEW JERSEY CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 26, 1968.
*303 Mr. Bertram M. Light, Jr. and Mr. Willard G. Woelper (now deceased) for plaintiff (Messrs. Toner, Vanderbilt, Michels & Light, attorneys; Mr. Douglas M. Crowley on the brief).
Mr. Robert B. Turk for defendant Essex Iron Works, Inc. (Messrs. Cohn & Turk, attorneys).
Mr. Seymour Margulies for defendants Acme Plastering Co., Inc. and Arctic Contracting Corp. (Messrs. Levy, Lemken & Margulies, attorneys).
*304 MINTZ, J.S.C.
Plaintiff First National State Bank of New Jersey (hereinafter bank) initially sought in this proceeding to foreclose a construction loan mortgage made by Carlyle House, Inc. (hereinafter Carlyle). The subject premises at the time the complaint was filed consisted of a partially constructed nine-story apartment house situate at 512-518 Bloomfield Avenue, Caldwell, N.J. On March 31, 1966 all parties in interest consented to a sale pendente lite. The property was sold on April 7, 1966 free of all liens, but by stipulation between the parties the action is proceeding as if an amount equal to the mortgage advances of $1,068,487.05 had been received from the sale. The rights of each of the parties to establish their priorities have been reserved.
The remaining answering defendants-counterclaimants Acme Plastering Co., Inc. (hereinafter Acme), Arctic Contracting Corp. (hereinafter Arctic) and Essex Iron Works, Inc., are subcontractors who supplied labor and materials on the job. They contend that the bank either is estopped from asserting the priority of its mortgage or is liable in damages for negligence, breach of trust and breach of its obligation to third-party beneficiaries. Additionally, Acme and Arctic each asserts a claim against plaintiff for conversion of certain materials.
Originally Irwin L. Glantz purchased the Bloomfield Avenue tract. He and David B. Pollins each invested $15,000 in the property. Glantz next conveyed the land to Carlyle, an entity whose issued stock was owned by Glantz and Pollins and which was organized for the specific purpose of acquiring title. This title, however, was subject to a $78,000 mortgage held by Frank Kalisch and others, which provided for its own subordination to any construction or permanent first mortgage loan. Hence, the equity of Carlyle in the proposed project would be slight.
On December 21, 1962 Washington Heights Federal Savings and Loan Association of New York City issued a commitment to Glantz and Pollins for a permanent mortgage loan for $1,500,000 on the subject property on which there *305 was to be erected a 106-family apartment building. As one of the terms for this loan, the borrower was required to secure a construction loan commitment.
In April 1963 Glantz and Pollins applied to the bank for a construction loan in the sum of $1,500,000. In support of this application they submitted personal uncertified financial statements in which they each showed a substantial net worth but a deficit working capital. Soon thereafter Azeglio T. Pancani, Jr. of Gerber and Pancani, architects for the project, sent the bank a cost construction estimate of $1,480,000. From Lehigh Construction Company the bank obtained another construction cost estimate of $1,554,700.
The bank checked with other banks and sources on the credit and experience in the construction field of the principals in Carlyle. It ascertained that Glantz and Pollins were constructing a high-rise apartment in New York City which was nearing completion, and that they could soon expect to receive funds from the same. Both the lending officers committee and the executive board of the bank approved a loan of $1,450,000, and a commitment letter dated July 23, 1963 was sent to Glantz. The commitment letter referred to a six-story apartment building, whereas in fact a nine-story building was projected. It called for the personal guaranties of completion by Glantz, Pollins and their respective wives. However, the wives never joined in any such undertaking. The commitment further stated that advances during construction would be limited to $1,400,000, with the remaining $50,000 to be advanced upon the issuance of a certificate of occupancy by the municipality.
Paragraph 12 of said commitment letter provided that:
"With each and every request for an advance under the construction loan, we are to be provided with at least three days prior to the anticipated date of disbursement, the contractor's requisition prepared in accordance with Paragraph 8 above, and we should receive from the general contractor an affidavit that all monies previously advanced have been disbursed to the sub-contractors and that there *306 are presently no amounts outstanding. A similar statement should also be obtained from the owners. Prior to the disbursement of funds, an inspection will be made by The National State Bank of Newark, Mortgage Department, and/or its designated representative."
Carlyle accepted the commitment on July 31, 1963.
The bank agreed to use Carlyle's attorneys, the New York City firm of Rubin, Baum & Levin, in connection with the preparation of the closing documents. Jack G. Friedman of that law firm submitted proposed forms for the closing to the bank, which turned them over for review to its attorneys Darby & McDonough. Friedman evidenced unfamiliarity with New Jersey law. Modifications were suggested by the Darby firm and accepted.
A title insurance binder dated July 23, 1963, purchased by Glantz from Inter-County Title Guaranty and Mortgage Company (hereinafter title company), insured the bank against loss not exceeding $1,450,000 on its proposed mortgage loan, and it was continued and certified to date of closing.
The construction mortgage, construction note, building loan agreement, completion bond signed by Glantz and Pollins, and agreement subordinating the Kalisch land mortgage were signed September 30, 1963. The mortgage and subordination agreement were recorded on October 4, 1963.
The mortgage expressly incorporates by reference the contemporaneously executed building loan agreement. Paragraph Second in the building loan agreement provided that:
"* * * The work to be done to the satisfaction of the party of the second part, and advances to be made only against an engineer's or architect's Certificate of in place value drawn in accordance with the cost estimate furnished, which Certificate shall also include the amount of work completed by trade and the percentage thereof and shall also bear an indication by the architect that the building is being completed in accordance with the plans and specifications approved by the permanent lender.
With each request for an advance there shall be delivered to the party of the second part an affidavit of the contractor and owner that all moneys previously advanced have been disbursed to sub-contractors and that there are presently no amounts outstanding."
*307 In connection with each construction loan advance the bank received the architect's report showing the in-place value of the work. It compared these figures against those submitted by engineers retained by it to estimate the value of such work, and those of Merritt & Harris, engineers for the proposed permanent mortgagee.
The parties to the construction loan agreement also utilized Friedman to coordinate the processing of the construction loan advances. The bank would forward cashier's checks for construction advances payable to the Rubin law firm and Carlyle. Before Friedman could release funds to Carlyle it was his task to ascertain and certify that the bank's mortgage remained a first lien, to make run-downs of title to date of disbursement, and to arrange for the execution of affidavits of the owner and contractor, pursuant to the commitment letter and building loan agreement, that prior advances had been properly disbursed, and he was to forward these affidavits to the bank.
Friedman provided a title continuation certificate dated October 1, 1963 in connection with the first proposed advance. Thereafter he forwarded to the bank copies of continuation certificates of title from the title company issued in duplicate to his law firm, in lieu of his personal certification.
On November 15, 1963 a construction contract was entered into between Carlyle and Malibu Construction Corp. (hereinafter Malibu) which latter corporation was organized for the specific purpose of serving as the general contractor for that job. Pollins signed this agreement as vice-president of Malibu and Glantz signed as president of Carlyle. No stock certificates were issued for Malibu but it was understood that Glantz and Pollins were equal owners of the corporation. Under this agreement Malibu undertook to erect the apartment house for the sum of $1,555,050. Although the bank had already advanced $31,635 on October 15, 1963 to cover preliminary expenses such as engineering fees, the building contract *308 between Carlyle and Malibu was not filed until April 14, 1964.
On April 20, 1964 Arctic entered into a contract with Malibu to perform concrete work for approximately $196,700. In June 1964 Arctic additionally contracted with Malibu for the heating and air conditioning work. Each of the contracts contained a provision (article 45) that "Notwithstanding anything to the contrary herein contained the Contractor [Arctic] hereby agrees not to record or file any liens, stop orders, notices of intention to claim a lien or the like at any time and the said Contractor hereby specifically waives its right to do so * * *." Before signing these agreements Arctic obtained a Dun & Bradstreet financial report on Columbia Realty, another corporation controlled by Glantz and Pollins. It also checked other contractors' experience with Glantz and Pollins. As a subscriber to Records Publishers, a weekly reporting service, it knew from its reports that the construction contract between Carlyle and Malibu was filed.
On December 16, 1964 Acme entered into a contract with Malibu to perform all the lath and plaster work for $162,500. In doing so it relied upon president Harry Pivnick's long acquaintanceship with Pollins and regard for his integrity. Four days later defendant Essex Iron Works, Inc. contracted with Malibu to furnish and install miscellaneous iron work for $20,000. These contracts contained the same article 45, a waiver of materialmen's statutory rights.
Construction started after an initial delay and continued to the fall of 1965. In the spring of 1964 a retaining wall along the rear property line collapsed resulting in a $30,000 increase in the cost. In July 1964 the shoring for the partially completed wall was knocked down and had to be replaced by Arctic at an additional cost of $30,000. These unforeseen expenditures were mainly responsible for the increase in the estimated cost of construction made in January 1965 to $1,599,083.
*309 The project soon began running into difficulties, and from December 1964 through September 1965 a number of mechanic's notices of intention and stop notices were filed against it. These filings were noted by the Title Company on the various continuation certificates mailed to Rubin, Baum & Levin, but the title company continued to certify that the bank mortgage was prior to any lien. The title company properly determined that the filed construction contract and specifications between Carlyle and Malibu prevented any subcontractor from perfecting a mechanic's lien. N.J.S. 2A:44-75. And it was not concerned about the stop notices since they do not constitute liens against the property. Lieberman, Abstracts and Titles (2d ed.), §§ 1146-1147.
On or about February 6, 1965 Arctic stopped work with about $65,000 due to it on its contracts. At this time Glantz and Pollins arranged for an additional $50,000 loan from the bank to be used for the agreed purpose of paying subcontractors. A note signed by Carlyle, and individually by Glantz and Pollins, evidenced the loan; the collateral security for repayment was Glantz' and Pollins' pledge of their Carlyle stock. This $50,000 advance forms no part of the bank's claimed priority.
Franz Fideli, vice-president of Arctic, was informed by Pollins and Glantz of the $50,000 personal loan. Fideli telephoned Edward L. Heil of the bank's mortgage department, who verified this fact. There is a dispute in the evidence as to what else transpired in said telephone conversation, but on February 26, 1965 Arctic resumed work on the project after receiving $20,000 on account on February 19. It finally stopped in September 1965 and belatedly filed a stop notice on November 29, 1965, though it had waived its right to do so by contract. According to Fideli, when Arctic ceased work there was due it on the two contracts plus extras, and the work performed as a result of the two collapses, the total sum of $180,480.17.
In July 1965, when Acme first began delivering materials to the Carlyle site, its attorney filed an ineffective mechanic's *310 notice of intention. By September Acme's president Pivnick was worried about Malibu's ability to pay, yet Pollins was pressing him to put as many men on the job as possible. Soon thereafter Acme ceased its work with some $47,567.78 due it, excluding the anticipated profit on the remaining work in the amount of $16,250. Essex Iron Works, Inc. completed its contract in the late summer of 1965 without being paid. A final judgment of $7,200 was entered on December 15, 1965 in favor of Essex Iron against Malibu.
When Malibu finally defaulted on the job in the fall of 1965 the bank had made 17 construction loan advances for a total of $1,038,744. The final advance was made September 7, 1965. Upon default the bank took possession of the subject property as mortgagee, engaged a watchman and insured the premises. Such additional expenses aggregated $29,743.05, making a total advance under the mortgage of $1,068,487.05. Since the bank's advances and costs have been stipulated to equal the proceeds of sale in foreclosure, no allegation of unjust enrichment can be leveled against the bank.
Defendants contend that the bank is estopped from asserting its mortgage lien as against them because by agreeing to advance funds to Carlyle it actually represented to defendants and other subcontractors who relied upon such representations that they would be paid. Since a party cannot assert an estoppel unless he relies upon a representation and his reliance is justifiable, Brower v. Glen Wild Lake Co., 86 N.J. Super. 341, 348 (App. Div. 1965), defendants' testimony in this regard must be carefully scrutinized.
Fideli testified that Heil, in requesting that Arctic return to the job, assured him that Arctic would be paid. I am satisfied that Heil never made any such representations. It is evident from Fideli's deposition that his conversation with Heil related solely to procuring a $20,000 payment out of the $50,000 personal loan given by the bank to Pollins and Glantz in February 1965. Such payment was made on or about February 19, 1965 and in connection therewith, *311 Arctic executed an assignment to the bank for the sum of $20,000 due it under its subcontract. Beyond that, Fideli had no discussions with the bank representatives. I am satisfied from all the testimony that neither Heil nor any other bank employee at any time assured Arctic that the bank would pay or see to it that Malibu would pay it the balance due, or any future sums to fall due.
Pivnick, president of Acme, a company in recent years doing an annual volume of $2,000,000 to $3,000,000 in lathing and plastering and considerably more in general contracting, is no tyro in the construction field. A man of 30 years' experience in this line, he had recently constructed for his solely-owned corporation the Partridge Run Apartments in Parsippany-Troy Hills, N.J., and on that project plaintiff bank had likewise provided the construction loan financing.
Pivnick testified that in connection with Partridge Run he had occasion to visit the bank monthly. He further testified that in January 1965 he informed Arthur Fricke, assistant cashier at the bank, that he was a subcontractor on the Carlyle job, and asked Fricke that he look after his interests in the same manner that he looked after the interests of subcontractors on the Partridge Run project. Fricke allegedly told him that he need not worry, and that the bank would look out for his interests. Again, in July 1965, at the start of Acme's activity at the site, Pivnick again allegedly spoke with Fricke who assured him he had nothing to worry over, that the bank controlled the money. Again, he testified that in the first week of August Fricke assured him that the bank had sufficient funds on hand to finish the job. In September, with pressure mounting on the job, he again spoke with Fricke, who again reassured him that he would be taken care of by the bank. Significantly and admittedly, Pivnick never received any written assurances from the bank, nor did he ever write the bank confirming any such assurances. I do not believe his testimony to the effect that on at least six occasions he *312 asked Fricke for a letter guaranteeing payment and Fricke told him it was unnecessary. Pivnick, in his deposition, testified that his first contact with the bank respecting the Carlyle job was with Heil at a meeting of subcontractors in October 1965 when his firm had already ceased work. In that deposition he made no mention of his alleged various contacts with Fricke. Fricke testified that he had no conversations with Pivnick in which he assured him of any payment by the bank. I believe Fricke and not Pivnick.
Eugene V. Moss, president of Essex Iron, testified that in August or September 1965, after his firm had fully completed its work, he phoned Fricke who told him there was "plenty of money" to finish the job. Fricke denied making this statement. He admitted that he received calls from subcontractors but always referred them to the owner. I am satisfied that Fricke did not make any statements to Moss which committed the bank to payment or formed the basis of any estoppel. Likewise, I find that no other bank official made direct representations or assurances to these defendants respecting payment.
The instant situation is therefore factually distinguishable from the cases cited by defendants, Anglo-American Savings and Loan Ass'n v. Campbell, 13 App. D.C. 581, 43 L.R.A. 622 (1898) and Schweitzer v. Equitable Savings and Loan Ass'n., 98 Wash. 139, 167 P. 111 (Sup. Ct. 1917). In the former case the conduct upon which an estoppel in favor of materialmen was premised was a direct promise on the part of the mortgagee to pay the owner.
In Schweitzer the agent of the mortgagee represented to plaintiffs that he had the mortgage funds in his possession, and told them to go ahead and do the work and that he would see that they were paid. Under these facts, the court held that the mortgagee would be estopped to assert that its mortgage was prior to the liens of plaintiffs for work and materials. Common to both cases are express promises or assurances by the mortgagee which are held to estop its priority. As noted above, I have found that the bank made *313 no such promises or assurances in the instant case. Cf. City Nat. Bank & Trust Co. of Salem v. Hassler, 9 N.J. Super. 153 (App. Div. 1950).
Moreover, the court in Anglo-American Savings and Loan Ass'n v. Campbell, supra, significantly stated that, notwithstanding the mortgagee's promises to pay the owner, had the mortgagee disbursed the funds it was duty-bound to pay him, the owner's creditors had no legal right to ask anything more and the mortgagee was not under a duty to see that the money it so advanced was applied to payments for labor and materials furnished in the construction.
As the contract between Carlyle and Malibu was already filed, defendant subcontractors can make no claim to a statutory lien under a mechanic's notice of intention. N.J.S. 2A:44-75, 76. The statutes covering the liens of mechanics, materialmen and laborers accord priority to a mortgagee who records his mortgage before any excavation, construction or the like, evidencing an intention to erect a building thereon, appears on the affected land. N.J.S. 2A:44-87, 88. When the bank recorded its construction loan mortgage on October 4, 1963, there were no signs of excavation or construction on the site.
Defendants also urge that they be given an equitable lien. The argument is that the mortgage funds and the arrangement for progress payments therefrom constitutes the material inducement to subcontractors, and that the lender cannot claim priority where it controls the funds and they have been diverted. Cf. McBain v. Santa Clara Sav. & Loan Ass'n, 241 Cal. App.2d 829, 51 Cal. Rptr. 78 (D. Ct. App. 1966), the holding of which was nullified by Cal. Code Civ. Proc., §§ 1190.1, 1193 (as amended, 1967); 4 Cal. Gov. Code § 4210 (as amended, 1967). However, as observed in Friedman v. Stein, 4 N.J. 34 (1950):
"The mechanic's and the materialman's liens had their genesis in the civil law. They are unknown to the common law; and they have had no recognition in equity except as prescribed by statute." (at p. 40)
*314 Despite the bank's priority, defendants contend the bank is liable to them because they were injured by its alleged negligent disbursements to Carlyle of the construction loan advances. Defendants allege that the bank, as controller of funds for a project conducted by an undercapitalized developer, owes a duty of reasonable case to them and failed to conform to reasonable commercial standards.
Initially it is to be noted that the Legislature in the Mechanics Lien Law (N.J.S. 2A:44-64 et seq.) has prescribed and carefully balanced the rights and duties of lenders, owners, general contractors, subcontractors and suppliers. It has indicated when a subcontractor may file a mechanic's notice of intention, lien claim or stop notice. It has resolved the competing interests on a policy basis, and the court should not be concerned with the wisdom of the legislative determination. N.J. Chapter, American Institute of Planners, etc., v. N.J. Board of Professional Planners, 48 N.J. 581, 600 (1967).
Notwithstanding the foregoing observation, defendant subcontractors ask the court to supplement the legislative scheme by imposing a duty upon the construction lender to carefully disburse advances with due regard for the interests of subcontractors. It is argued that the concept of foreseeability governs the determination as to whether a reasonably prudent person is negligent in undertaking a course of conduct which results in injury or loss. Thus, if a reasonably prudent person should foresee that his act or omission creates an unreasonable risk of harm, he is guilty of negligence if his conduct through a chain of causation causes injury to a victim and it was a substantial factor in that chain of causation, even though the particular victim who was injured, or the particular injury sustained by the victim, was not itself specifically foreseeable. However, foreseeability of harm in itself does not give rise to a duty. In Goldberg v. Housing Authority of Newark, 38 N.J. 578 (1962) the court held that the owner of multi-family structures was under no duty to provide police protection. It stated:
*315 "The question is not simply whether a[n] * * * event is foreseeable, but whether a duty exists to take measures to guard against it. Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution." (at p. 583)
See also Reimann v. Monmouth Consolidated Water Co., 9 N.J. 134, 137 (1952); Bergen v. Koppenal, 97 N.J. Super. 265, 269 (App. Div. 1967).
Defendants urge that a confluence of policies should impel the court to declare that a construction lender, who advances monies to a speculative, undercapitalized developer, owes a duty to materialmen to see that the owner or contractor properly disburses these funds. In this vein defendants heavily stress Connor v. Conejo Valley Development Co., 61 Cal. Rptr. 333 (D. Ct. App. 1967). There an institutional lender arranged with a builder of doubtful reputation and insufficient capitalization to finance a housing development for low income owners. The court concluded that the lender owed a duty to unsuspecting consumers to protect them from gross structural hazards, i.e., it knew or should have known that the homes were being built in such a manner as to substantially decrease their value to their owners.
The court observed that:
"* * * It is a matter of fact that Great Western, by lending the sum of approximately three million dollars to an inexperienced developer, whose own direct financial contribution was nominal by comparison and who was unprepared to assume any personal financial responsibility for the venture, at least demonstrated a bland disregard for the ultimate consumer, let alone its own security.

* * * * * * * *
The fact, however, that Great Western was not, by virtue of an agency relationship, a direct participant in the home construction fails to convince us that its position as lender fully insulates it from responsibility to the ultimate purchasers. * * * Public policy casts its persuasive shadow in this instance and we believe that low-income home purchasers are entitled to protection from substantial structural defects which would not be disclosed by a reasonable inspection. Those who furnish almost total financing for tract construction, the admitted aim and goal of which is the sale to the uninformed *316 public of numerous dwellings constituting a residential subdivision, thereby undertake a duty to that segment of the public which represents the potential market for such dwellings, at least to the extent of protecting these persons from gross structural hazards. Were the facts herein related submitted to a jury, its members might reasonably infer that Great Western breached this duty to the public in one or more of several ways, i.e., by negligent appraisal and representation of the value of the homes, by negligent failure to ascertain soil conditions and insure that recognized precautions be taken to compensate for expansive soil, by negligent approval of packaged plans and specifications, by negligently engaging in total financing of an insubstantial and inexperienced developer on a tract of major proportions in a new area, or by failing thereafter adequately to inspect the work in progress to discover any defects.

* * * * * * * *
* * * Behind every developer is a lending institution, and the degree of its responsibility should be measured in inverse proportion to the degree of experience, skill, and responsibility which characterizes the borrower-developer.
We do not foresee that the extension of potential liability and the recognition of the financer's duty to the public under these conditions will either disrupt the logical sequence of legal development or subject lenders to undue risk. We merely acknowledge herein the obligation which must ultimately be assumed by the participant best able to bear the financial risk, and infinitely better able than the public to protect both itself and others from the risks of irresponsible construction ventures in our age of mass residential production. The experienced institutional lender is the party with the awareness, expertise, and opportunity to control the course of construction." (at p. 340)
Different "delicate policy judgments," Id., at p. 344, are involved in making a declaration of duty in the present case. Defendant subcontractors are not members of the "uninformed public," Id., at p. 344, but are experienced hands in the construction industry. They might have a lesser ability to bear loss than might an institutional lender, but since the volume of business of Acme and Arctic, in particular, annually reaches into the millions of dollars, enterprises such as these cannot be compared with prospective low-income homeowners. Indeed, the class of subcontractors frequently includes substantial business enterprises. Another important distinction lies in the relative abilities of the subcontractors and home purchasers vis a vis the lending institution *317 to judge, on the one hand, the solvency, reliability and experience of the developer, and on the other gross structural defects not visible upon reasonable inspection. Clearly, the ability of a member of the "uniformed public" to detect such defects is inferior to that of the lending institution that, for instance, has access to expert advice to assess plans and specifications submitted in the developer's loan application. However, the ordinary subcontractor who contemplates contracting with an undercapitalized developer has a number of checking procedures customarily available to him. Generally, he can inquire of other contractors about their experience with the developer, consult trade association lists of unreliable borrowers with past records of defalcation, obtain financial reports on the principals, and subscribe to reporting services which apprise him of all claims filed against the property and the owner. Therefore, he is far better prepared to assess his risks of dealing with the undercapitalized developer than the homeowner in Connor v. Conejo Valley Development Co., supra.
In weighing whether it is fair to impose upon construction lenders a duty to subcontractors to supervise the disbursement of the lender's advances, a comparison should be made of the lenders' and subcontractors' relative abilities to best prevent default. Only if the lender is in a clearly superior position to assess the risks of dealing with the undercapitalized developer should this factor of better preventive ability contribute to the creation of a lender's duty to subcontractors.
Defendant subcontractors, experienced concerns in the construction field, either relied upon financial reports or upon a principal's personal knowledge of the developers, and were aware when contracting with Malibu of the significance of the waiver of their statutory remedies. When, as the work progressed, adequate payments were not forthcoming and ineffective mechanic's notices of intention and stop notices began to appear, the subcontractors were alerted to cease work considerably sooner than they did, thereby minimizing *318 their losses. They complain that these red lights should have alerted the bank to ascertain that its advances were being properly disbursed. However, the light was equally red for defendants, who continued to supply labor and materials with knowledge of these facts. They simply took a business risk by staying on the job for a longer period than prudence dictated.
Overall, it is the opinion of two experts that lenders and subcontractors
"* * * are equally competent at predicting which borrowers are going to default and at relaying the cost. Wherever liability is placed initially, the group held liable could be expected to alter its credit practices and to pass its increased costs to borrowers. Since most lending institutions are larger than most supply companies, it might be assumed that lenders can better predict the risks of default. But institutional lenders have not yet developed and installed refined methods for screening prospective borrowers. Both lenders and suppliers know something about the comparative trustworthiness of the developers with whom they deal, and adjust their practices accordingly. While the causes of construction loan defaults vary, they can usually be traced to a borrower who is incompetent, undercapitalized, or fraudulent. On balance, neither lenders nor suppliers seem adept at marshaling specific information about the types of borrowers likely to generate such losses.
* * * both groups have the capacity for preventing difficulties by dealing with honest men of proven financial skill, running careful credit checks, and informing one another of bad experiences. * * * When neither group is clearly better at preventing, prevention must be ruled out as a criterion for deciding between them." Lefcoe and Schaffer, "Construction Lending and the Equitable Lien," 40 So. Calif. L. Rev. 439, 447-9 (1967).
Defendants further argue that it would be fair to impose a duty upon lenders to supervise the disbursement of their advances because the reasonable expectations in the trade of subcontractors is that they can rely on the lender's careful control over its disburser, and reasonable banking practice requires such control be taken.
Defendant subcontractors cite Hiller & Skoglund, Inc. v. Atlantic Creosoting Co., Inc., 40 N.J. 6 (1963), for proof that the construction industry runs on credit and all parties *319 depend on the source of credit, the lender, for protection. At page 24 the court recites that
"* * * in the construction industry, business is customarily done on credit  the promises the industry lives by. The prime contractor expects to pay his subcontractor from installment payments received from the owner and the materialman depends on the subcontractor to make payment out of the money the latter has received. Each party in the chain fully realizes what business practice requires of him and business stability depends on conformity even when the going becomes rough. The law should be framed accordingly."
Defendants, borrowing from Connor v. Conejo Development Co., supra, 61 Cal. Rptr., at p. 347, argue, additionally, that when subcontractors deal with undercapitalized owner-prime contractors, their degree of reliance for payment on the lender's careful supervision of construction advances heightens.
The description of construction industry expectations in Hiller, supra, fails to reveal reliance running beyond those with whom a party is in privity. It explains only that each link in the chain (e.g., subcontractor) relies upon the previous link's (contractor's) adherence to what "business practice requires of it." The testimony of Pivnick in regard to his experience with the bank on his Partridge Run loan tends to rebut his inference that subcontractors customarily rely upon the lenders to carefully supervise disbursements of advances. On that loan, in which the bank allegedly "looked after" the interests of the subcontractors, Pivnick testified that the bank made advances totaling $1,300,000 out of a total loan of $1,850,000, before requiring the submission of any affidavit, although the building loan agreement called for a general contractor's affidavit with each requisition for an advance. Apparently defendants contend that subcontractors, in staying on a job for an undercapitalized developer, rely even more heavily upon the diligence of the lender. Yet there is not an iota of proof that defendants in the instant situation relied upon the bank's *320 chosen method of supervising the disbursement of its advances.
Additionally, the court in Hiller was concerned with the construction and intended effect of the Trust Fund Act, N.J.S. 2A:44-148, respecting monies paid by the State, county or municipality pursuant to a contract for a public improvement. Defendants in the case at bar do not point to any statute that directly or inferentially creates a duty on the part of the lender to the subcontractor.
To support their argument that reasonable banking practice dictates a duty for lenders to control disbursements to the benefit of subcontractors and the like, defendants cite the Mortgage Officer Handbook, published by the American Bankers Association. The publication, a copy of which was at the bank, suggests that before a construction lender makes his advances it is "good policy" for the builder to support his monthly request for funds with an affidavit that the subcontractors and materialmen have paid in accordance with their contracts. However, the handbook states that the affidavits "may not be essential" if the lender, as in the instant case because of the filing of the general contract, N.J.S. 2A:44-76, 77, is not concerned with mechanics' and materialmen's liens that can take priority in lien over the mortgage.
In the instant case the commitment letter and building loan agreement provide that this procedure be implemented: that the owner and general contractor execute affidavits that the monies previously advanced have been disbursed to subcontractors and no amounts are presently outstanding. The first of these affidavits was supplied in connection with the seventh advance made on November 12, 1964. The bank had made no requests for affidavits to support the earlier advances. Friedman, acting as a notary public, did not administer a formal oath to the affiants on the affidavits furnished to the bank. Some of the affidavits state that the monies previously advanced "will be disbursed" in accordance with the trade payment breakdown. Such in *321 futuro affidavits are not what the parties bargained for, and are suspect. In no case did the borrower submit both an affidavit of the owner and general contractor as prescribed. Evidently the bank was slipshod in its acceptance of the affidavits contractually required of the owner and contractor.
Nevertheless, the handbook of banking practice which suggests this procedure at best serves to establish guidelines to bank employees, and as its preface states its various suggestions may be disregarded if a bank considers them not suitable for a particular construction job. Moreover, there is no indication that a recommended practice such as this serves as an acknowledgment by the banking industry of a duty owed by lenders to subcontractors; it only indicates that the requirement of affidavits is a device of the bank to protect its own interest.
Also, by imposing a duty upon a lender to supervise the disbursement by the owner-mortgagor of construction loan advances, the added burden of mandatory supervision could cause lending institutions to hesitate to engage in construction financing to the detriment of the building industry. Probably the cost of borrowing for construction would increase. The view also has been expressed that added costs would, in particular, harm the undercapitalized promoter, perhaps a desirable business catalyst, who "helps to assure that growing demands for housing are met by inventively generating incremental sources of capital for real estate improvements * * *." 40 So. Cal. L. Rev. supra, at p. 450. In any event, the public interest will not be served by the imposition of the proposed liability upon lenders.
Furthermore, the comprehensive ordering by statute of the rights, obligations and priorities of the parties involved in the construction industry certainly gives rise to an inference negative to the declaration of the imposition of a common-law duty upon one of the parties.
Thus, no sound basis has been advanced for protecting the subcontractors on their business risks by imposing upon the bank the duty to supervise the owner's disbursement of *322 its advances and the bank's consequent liability for negligent performance thereof.
Defendants urge as an alternative ground for relief that the bank participated in a breach of trust. N.J.S. 2A:102-10 provides that monies received by a contractor from an owner or mortgagee for the construction of a building are "trust funds in the hands of the contractor" for the payment of claims due from the contractor to persons furnishing labor or materials for the construction. Any contractor who appropriates such funds for any other purpose prior to the payment of such claims is guilty of a misdemeanor. There is dispute as to whether a civil remedy is available to a subcontractor so that he may recover "trust funds" paid over to a contractor and wrongfully paid out prior to the satisfaction of the subcontractor's claim. Compare Plevy v. Schaedel, 44 N.J. Super. 450 (Law Div. 1957), with Carrier Corporation v. J.E. Schechter Corporation, 347 F.2d 153 (2 Cir. 1965). Assuming the availabilty of a civil remedy in order to implicate the bank in the alleged breach of trust, there must be proof of the bank's knowing participation in the same. Judson v. Peoples Bank and Trust Co., 25 N.J. 17, 29 (1957). There is none.
Defendants assert, as another basis for relief, that they are third-party beneficiaries under the commitment letter and building loan agreement between the bank and Carlyle, each of which calls for the aforementioned affidavits. The bank was to assure itself of the completion of construction by obtaining affidavits by the owner and contractor that disbursements of its advances had been properly made. This third-party beneficiary theory fails. A party cannot enforce provisions of a contract to which he is not a privy, unless it is clear that the parties to the contract intended to confer upon him the right to enforce it. Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73 (E. & A. 1939). The terms of the commitment letter and building loan agreement do not indicate such a clear intent. The bank required the execution of affidavits to protect itself against having to foreclose *323 on a partially completed structure. From the bank's own point of view, it may have unwisely waived the requirement of a properly executed affidavit in support of each advance, but the agreements gave defendants no right to enforce such terms to the defendants.
Additionally, Acme claims that when it walked off the job certain unincorporated materials were left on the site, and that they were not permitted to remove materials valued at $12,453.90 and certain tools. Robert M. Elkins, the president of Arctic, testified that a Pollack, the watchman engaged by the bank when it took possession as mortgagee, refused permission to remove the tools and materials, but that after he made a telephone call to Kesselhaut, Arctic's attorney, Arctic was permitted to remove the tools but not the materials. Pivnick of Acme likewise testified that when his company ceased work on the project his company left uninstalled materials on the site valued at $14,500 plus certain equipment amounting to $4,500. In his deposition he valued the materials at only $10,000. He wished to remove the same, but Pollack indicated to him that nothing could be removed. No officer of Arctic or Acme contacted any bank officer in connection with such claims. Their only alleged discussions respecting the materials and equipment were with Pollack and their attorney, Kesselhaut. Pollack's normal function was not to release materials except upon proper authorization. Under these circumstances the conversion claims of these respective defendants must also fail. Mueller v. Technical Devices Corp., 8 N.J. 201 (1951) is precisely in point. The court, in denying a claim for conversion of plaintiff's chattels by defendant corporation there said that
"The demand made by Mueller for possession of the property was made upon a person who had no authority to deliver the chattels. Saltz was merely a workman in charge of factory operations; he had no authority to let any property go out of the plant without the approval of the directors. A failure to surrender goods constitutes a conversion only if the demand is made upon a person obligated to surrender the goods, or if made upon an agent or employee such *324 power must be within the scope of his agency or employment. With respect to a demand on a corporation, it must be made upon an officer or the governing body authorized to act thereon." (at p. 211)
Accordingly I find that defendants should not prevail upon any of their asserted claims against plaintiff.
Acme and Arctic are entitled to recover on their respective cross-claims against Malibu. Judgment will be entered on Acme's cross-claim in favor of Acme and against Malibu in the sum of $63,817.78; and on Arctic's cross-claim in favor of Arctic and against Malibu in the sum of $180,480.17.