748 A.2d 1221 (1998)
330 N.J. Super. 172
PARKWAY INSURANCE COMPANY, Plaintiff,
v.
NEW JERSEY NECK & BACK as Assignee of Clemente Mendoza; Clemente Mendoza, New Jersey Neck & Back as Assignee of Aida Acosta; Aida Acosta; Accident Therapy Center as Assignee of Ramon Peralta; Ramon Peralta; Accident Therapy Center as Assignee of Prisilla Illa; Prisilla Illa; Injury Treatment Center as Assignee of Claribel Azcona; Clari bel Azcona; Junction Diagnostics as Assignee of Claribel Azcona; Injury Treatment Center as Assignee of Marabel Azcona; Marabel Azcona and Junction Diagnostics as Assignee of Marabel Azcona, Defendants, and American Arbitration Association, Defendant in Interest.
Superior Court of New Jersey, Law Division, Morris County.
Decided October 1, 1998.
Revised October 14, 1998.
*1223 Robert Francis Gold, Morristown, for plaintiff (Gold & Albanese, attorneys; Mr. Gold and Daniel S. Hunczak, Belmar, on the brief).
Patrick J. Mangan, Edison, for defendant Injury Treatment Center (Howard Z. Buckner, attorney; Mr. Buckner, on the brief).
Anthony B. Vignuolo, North Brunswick, for defendant New Jersey, Neck & Back (Borrus, Goldin, Foley, Vignuolo, Hyman, Stahl and Clarkin, attorneys; Mr. Vignuolo, on the brief).
VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
Plaintiff, Parkway Insurance Company ("Parkway"), filed an Order to Show Cause and Verified Petition in the Superior Court of New Jersey seeking the following relief:
a. A declaration that the medical provider assignees had no standing to have filed for arbitration through the American Arbitration Association ("AAA"), hence precluding coverage under the Parkway insurance policy for the claims submitted by said defendants;
b. A declaration that the plaintiff is not obligated to pay any medical bills submitted by the defendants as assignees;
c. A dismissal of all arbitration hearings pending with the AAA filed by defendant assignees for personal injury protection ("PIP") benefits through Parkway.
Counsel for Injury Treatment Center ("I.T.C.") and New Jersey Neck & Back Center (improperly pled as New Jersey Neck & Back) ("NJNBC") filed opposition to the Order to Show Cause and moved to dissolve preliminary restraints which this court had issued. On the return date, the court reserved decision.
At issue is whether the prohibition against assignment of medical expense benefits contained in Parkway's automobile insurance policies is enforceable against the medical provider assignees in this case without the written consent of Parkway.
Parkway, as well as numerous other insurance companies, is a member of the Insurance Services Office, Inc. ("ISO"). ISO is an underwriting company that submits forms of insuranceas well as endorsements consistent with legislative enactmentson behalf of the insurance industry and its members to the Commissioner of Banking and Insurance of New Jersey ("Commissioner")[1] for approval. On December 7, 1995, the Commissioner approved ISO PAP94, wherein Part F General Provisions, Transfer of Your Interest *1224 in this Policy provides in pertinent part:
"Your rights and duties under this policy may not be assigned without our written consent."
The Commissioner also approved the endorsement language under Section IV Part FGeneral Provisions, Part D Payment of Benefits that
1. We may, at our option, pay any medical expense benefits or essential service benefits to the:
a. "Insured", or
b. Person or organization providing products or services for such benefits.

I.
In an effort to review and investigate claims of insureds, Parkway, as a general policy, attempts to contact its insuredas well as tortfeasorsto obtain statements. It additionally attempts to contact and obtain records from treating medical providers regarding an insured's injuries and treatments. Further, Parkway conducts investigations into prior accidents, subsequent accidents, PIP eligibility checks, as well as conducting peer reviews and independent medical examinations. Parkway finds these investigative procedures are necessary due to the failure of its insureds, as well as medical care providers, to provide basic information regarding the causation of the accidents and due to the difficulty in verifying treatment from the providers' records. As is evidenced in Parkway's submissions, it has gone to great expense in its attempt to verify claims and thereafter make payments for medical services which were reasonable and necessary.
In 1996 Parkway was billed $28,630 by NJNBC; in 1997 Parkway was billed $60,340; in 1998 Parkway was billed $27,960. Hence, the total amount that NJNBC has billed Parkway is $116,930. Parkway has made payments to NJNBC of $13,207, leaving an alleged balance of $103,722. The only patients designated in its opposing papers are Aida Acosta and Clemente Mendoza. The only patients designated by I.T.C. are Claribel Azcona and Marabel Azcona.
Since 1996 Parkway has attempted unsuccessfully to obtain all the necessary documents from the medical providers, insureds and other claimants, and Parkway has been unable to obtain examinations under oath of some claimants. This court finds its unnecessary to recite, ad nauseam, all the other facts contained in Parkway's supporting papers.
The record is replete with examples of lack of cooperation by the aforementioned insureds, passengers and medical providers. Defendants lack of cooperation in this case alone has cost Parkway $17,510.85 for legal, medical and investigative services. One of the continuing problems Parkway has encountered is that most of the claimants have received treatment from multiple medical providers. For example, Parkway received records from only three of Aida Acosta's nine medical providers and from only one of five of Claribel Azcona's medical providers. Clemente Mendoza and seven of his nine medical providers have been uncooperative in Parkway's attempts to verify not only Mendoza's injuries, but also the reasonableness and necessity of his treatment by these nine medical providers. Parkway has received only two sets of medical records with regard to Prisilla Illa's five medical providers. These actions clearly violate N.J.S.A. 39:6A-13. This lack of cooperation shows one reason why a prohibition against assignment without Parkway's consent, in the language approved by the Commissioner, is included in all of Parkway's automobile insurance policies.
Parkway contends that both insureds and medical providers make little or no effort to cooperate with Parkway in its attempts to verify the reasonableness or necessity of treatment. Moreover, it is usually only after the providers seek payment and file AAA arbitrations that they *1225 supply the requisite medical records, regardless of prior requests for same. Another quandary with assignments arises when a claimant fails to appear for requested examinations under oath and independent medical examinations and when medical providers fail to provide requested records. An insurer cannot adequately defend its interest if an investigation has been thwarted by the same individuals who have the burden of establishing the reasonableness and necessity for the treatment providedthe patients and their medical providers.

II.
It was because of this lack of cooperation and fraud that the Legislature, commencing in 1977, began to limit eligibility for PIP benefits. The Legislature empowered the Commissioner to authorize policy language, such as requiring the written consent of the insurer before assignment of benefits. As illustrated below, to permit otherwise would allow a party with the burden of establishing reasonableness and necessity of treatment to receive benefits without cooperation of the insureds and other claimants, thus breaching contracts of insurance. This, arguably, is one of the many reasons that New Jersey's automobile insurance premiums are among the highest in the nation.
In Richman v. Pratt, 174 N.J.Super. 1, 414 A.2d 1371 (App.Div.1980), the court determined that, because the New Jersey Automobile Reparation Reform Act (the "Act" or sometimes referred to as the "no fault statute"), N.J.S.A. 39:6A-1 to 34, failed to include language expressly exempting PIP benefits from execution by judgment creditors (similar to the workers' compensation and unemployment compensation statutes), PIP benefits were not exempt from execution by a judgment creditor. On June 9, 1980, in response to the Richman decision, the Legislature amended the Act to expressly exempt PIP benefits from assignment, levy, execution, attachment or other process for satisfaction of debts. See N.J.S.A. 39:6A-4(2).
In 1983, the Legislature further amended numerous portions of the Act and, specifically, N.J.S.A. 39:6A-4(2), to add "... except to a provider of service benefits under this section...."[2] While I.T.C. argued that this language was included because (a) the statute contemplates the lack of a contractual relationship between a medical provider and an insurance company and (b) the statute specifically authorizes assignments as a legitimate means for a provider to secure payment for services performed, there is no support for this contention. The Senate statements regarding this amendment are silent. Moreover, the cases relied upon by the defendants do not address the Act, or any aspect of automobile insurance law. See Elat, Inc. v. Aetna Cas. and Sur. Co., 280 N.J.Super. 62, 654 A.2d 503 (App.Div. 1995), and Flint Frozen Foods v. Firemen's Ins. Co. of Newark, 12 N.J.Super. 396, 400, 79 A.2d 739 (Law Div.1951) (citing Combs v. Shrewsbury Mutual Fire Ins. Co., 32 N.J.Eq. 512 (Ch. 1880)), rev. on other grounds, 8 N.J. 606, 86 A.2d 673 (1952).
Over the years, the Legislature has made numerous amendments to the Act. In 1983, due to the failure to achieve the goal of cost containment of automobile insurance, the Legislature enacted the "New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984." L.1983, c. 362, effective October 4, 1983. In an attempt to reduce the costs for automobile insurance, the 1983 enactment was more restrictive as it enlarged the classes of exclusions from coverage in N.J.S.A. 39:6A-7(b) and tightened eligibility for PIP benefits. For example: (1) only a named insured or resident relative was now permitted to recover when involved in an accident "while occupying, *1226 entering into, alighting from or using an automobile ...;" (2) PIP carriers could now subrogate against tortfeasors; (3) "stacking" of PIP policies by by insureds was prohibited; and (4) income continuation benefits were limited to an individual's net income to prevent a windfall benefit. These restrictions were, as the Senate statement explained, "designed to tighten statutory eligibility requirements for personal injury protection coverage so as to comport with the original intent of the no fault law."
Further, in July 1997, the General Assembly, as part of Bill 3126, created a Division of Fraudulent Claims within the Department of Insurance. This Division was created to investigate alleged fraudulent claims as it was apparent to the Legislature that numerous medical providers were taking advantage of insurance programs that paid for medical treatment, and because the Legislature believed that "it has been impossible to successfully challenge either the reasonableness of the amount charged for medical services or the medical necessity for certain procedures." Ibid.
Similarly, in December 1977, the Commission to Study the Automobile Reparation Reform Act made recommendations designed to combat fraud and unnecessary use of benefits. Evidence provided to the Commission indicated that individuals were receiving excessive treatment for minor injuries and that insurers had little recourse to combat the same. This evidence led the Commission to recommend a Regional Claims Review Board that would look for excessive treatment and unusual billing practices for benefits under no-fault insurance. The Commission also recommended an extension of the time period in which claims had to be paid by insurance companies, stating: "This approach would provide a workable mechanism to deal with the problems of fraud and overutilization of benefits provided under no-fault insurance."
On January 10, 1996, the Legislature again amended the no-fault statute, further limiting benefit eligibility by requiring medical providers to give notice to an insurer "no later than 21 days following the commencement of treatment." N.J.S.A. 39:6A-5a. "In the event that notification is not made by the treating medical provider within 21 days following the commencement of treatment, the insurer shall reserve the right to deny ... payment of the claim and the treating medical provider shall be prohibited from seeking any payment directly from the insured." N.J.S.A. 39:6A-5c. These amendments balanced the interests of the insured in having medical bills paid with the insurers' interests in cost reduction. This balancing carried out the Legislature's goal of automobile insurance premium reduction while continuing comprehensive no-fault coverage.
Thus, given the legislative amendments to the Act which have required stricter eligibility requirements in order to reduce insurance costs and prevent fraud, it is clear to this court that the statute as amended did not intend to authorize an insured to unilaterally assign his rights or duties under a contract for insurance to a medical provider. Rather, based on the Legislature's pattern of restricting eligibility, it appears to the court that the language of N.J.S.A. 39:6A-4(2) was included for administrative purposes, in an ongoing effort to enable insurance companies to reduce automobile insurance premiums.
In an effort to further effectuate the goals of the Act, the Legislature empowered the Commissioner to ".... adopt, promulgate, rescind and enforce such reasonable rules and regulations as may be required to effectuate the purposes of this act." N.J.S.A. 39:6A-19. See also N.J.S.A. 17:1-8.1. Furthermore, N.J.S.A. 39:6A-20 empowers the Commissioner with "all of those general powers as enumerated in Title 17 of the Revised Statutes." Throughout N.J.S.A. 39:6A-1 to -34, N.J.S.A. 17:33A-12, and N.J.A.C. *1227 11:1-2.1, the Legislature has empowered the Commissioner to adopt rules and regulations as well as policies and forms of insuranceendorsements to further the Legislature's goals of providing no-fault insurance while achieving cost containment and ultimately a reduction in the costs of insurance to the general public.
In Smith v. Motor Club of America Insurance Co., 54 N.J.Super. 37, 148 A.2d 37 (Ch.Div.), aff'd, 56 N.J.Super. 203, 152 A.2d 369 (App.Div.1959), the court held that:
It requires no citation of authority for the well-settled proposition that public policy is declared by the Legislature and that it is not the province of the court to declare it, but to follow it. The Legislature, having vested the Commissioner of Banking and Insurance with authority to strike from policies any clauses he deems to be unfair or inequitable, and the Commissioner having taken no such action with respect to the clause in question, it must be presumed that he did not consider it unfair or inequitable and that it is not against public policy.

Id. at 43-44, 148 A.2d 37.
Thus, so long as the Commissioner's rules and regulations are consistent with the statutes and public policy, his authority is absolute. Only if the Commissioner's approval of forms of policies and endorsements conflict with coverage required by statute, or are against public policy, is his authority superseded and the policy form read to be consistent with the statute. Motor Club of America Ins. Co. v. Phillips, 66 N.J. 277, 286, 330 A.2d 360 (1974); Longworth v. Ohio Casualty, 213 N.J.Super. 70, 516 A.2d 287 (Law Div. 1986), aff'd sub nom, Longworth v. Van Houten, 223 N.J.Super. 174, 538 A.2d 414 (App.Div.1988).
Since the language in the Parkway policy, including language requiring the written consent of the insurer before assignment, was approved by the Commissioner, it follows that the Commissioner did not find this provision unfair or inequitable or violative of public policy. The policy language provides a pragmatic method of advancing the interests of the insurer to investigate and process claims efficiently (which reduces costs which saving will be passed on to New Jersey motorists) while facilitating the payment of reasonable and medically necessary treatment to an insured. Further, the court finds that the policy language, as approved by the Commissioner, is consistent with statutory language and is not contrary to the Legislature's intent of affording coverage while containing costs.

III.
N.J.S.A. 39:6A-4(2) does not prohibit the assignment of benefits to an insured's medical providers. The statute clearly contemplates that benefits payable under N.J.S.A. 39:6A-4 are capable of being assigned ".... to a provider of service benefits under this section...." However, this provision of N.J.S.A. 39:6A-4(2) has a narrow context when considered with the entirety of N.J.S.A. 39:6A-4, wherein it states that "[e]very automobile liability insurance policy ... shall provide personal injury protection coverage, ... under provisions approved by the Commissioner of Banking & Insurance, for the payment of benefits without regard to negligence ...," and provisions in the policy of insurance approved by the Commissioner wherein "medical expense benefits ... may be paid at the option of the Company to the eligible injured person or the person or organization furnishing the products or services for which such benefits are due." (Emphasis added). Thus, the assignment provision of N.J.S.A. 39:6A-4(2) is consistent and concomitant to the provisions approved by the Commissioner for payment of "medical expense benefits ... at the option of the Company ...," as the Commissioner is the administrative agent of the Legislature, pursuing its public policy.
Here, the provision precluding assignment of rights or duties without the written *1228 consent of the insurer provides the manner by which the parties who contracted must proceed when an insured seeks to assign his rights or benefits under the policy. For this court to find otherwise would force insurers to deal with parties with whom they had not contracted, violating the basic tenet and public policy of freedom of contract. It further would force the insurers to incur repeated arbitration costs such as filing and attorney fees, all with the potential of contradictory or varying results. This would not only increase the costs to insurers but also, and importantly, pose possible estoppel arguments.
Permitting unrestrained assignments is contrary to the legislative intent of the Act and the public policy of attempting to reduce insurance premiums to New Jersey drivers. By permitting the insurer to consent to an assignment, when justified, the insurer is able to contain costs. Enforcement of the non-assignment clause does not cause any forfeiture of benefits, either to the insured or his medical providers. Rather, it serves as a cost-controlling measure whereby insurance premiums are stabilized and hopefully reduced by eliminating unnecessary court proceedings, arbitrations and fraud.
This court finds that Parkway's automobile insurance policy clause requiring its written consent prior to the assignment of the policy's rights or benefits should be given effect. The court's finding is bolstered by law in Colorado, where the statutory scheme is similar to that of New Jersey. Both New Jersey and Colorado have similar statutes mandating a system of no-fault automobile insurance. The statutory scheme of both states is similar throughout the Colorado Revised Statutes, § 10-4-701 et seq. and N.J.S.A. 39:6A-1 to -34. Parrish Chiropractic Centers, P.C. v. Progressive Casualty Insurance Company, 874 P.2d 1049 (Colo.1994). The Colorado statute, C.R.S. § 10-4-708(2), deals directly with the subject matter at issue herein: whether a medical provider can enforce a unilateral assignment of medical benefits if there is a requirement in the insurance policy mandating an insured to obtain written consent of the insurer.
C.R.S. § 10-4-708(2) reads as follows:
Benefits provided under section 10-4-706(1)(b) to (10)(e) or alternatively, as applicable, section 10-4-706(2) or (3) may be paid by the insurer directly to any person supplying necessary care, treatment, products, services, or accommodations to the person for whom benefits are required under section 10-4-706(1)(b) to (1)(e) or alternatively, as applicable, section 10-4-706(2) or (3).
This language is similar to the policy provision approved by the Commissioner of Banking and Insurance of New Jersey wherein an insurer "may, at [its] option, pay any medical expense benefits ... to the insured or person or organization providing products or services for such benefits." Section F, supra.
The reason cited by Progressive Casualty Insurance Company for its change in payment policy was that:
according to experience and economic studies, treatment with Parrish took considerably longer and was considerably more expensive on the average than with other chiropractors, and because allowing an assignment diminished the insurer's and insured's ability to control the frequency and costs of treatment and increased Progressive's administrative costs in dealing with the provider as well as the insured.
Parrish, 874 P.2d at 1052.
The same is true herein.
In Parrish, supra, the Court held that, under Colorado's no-fault statute, when there is a non-assignment clause in the policy, assignments of benefits without the written consent of the insurer are void and unenforceable against the insurer. In that case, plaintiff, a chiropractic clinic, sought to enforce an assignment it received from *1229 one of its patients. The defendant, a no-fault insurer, refused to honor the assignment and paid benefits directly to the insured. The chiropractic center sued, arguing that the assignment of rights executed by its patient entitled it to direct payment. Id. at 1052. The defendant argued that the assignment of benefits violated the express terms of the policy and was therefore void ab initio. The defendant additionally argued that the plaintiff was not an intended third-party beneficiary of such policy, but rather, merely received an unintentional, incidental advantage from the policy.
The Colorado Supreme Court held that the non-assignment clause was valid since, although contract rights are generally assignable, where a contract in question specifically prohibits the assignment of rights or interests under it without the consent of one or more of the contracting parties, any purported assignment without such consent will not be enforced. Id. at 1052 (citing 16 Couch on Insurance 2d § 63:159 (1983)). Furthermore, "[i]f the insurer's consent is essential to the validity of the assignment, an assignee acquires no right in the absence of such consent." Id. at 1052 (quoting 2A John Appleman & Jean Appleman, Insurance Law and Practice § 1193 (1996)).
The plaintiff in Parrish argued that a loss referred to in the insurance policy should be interpreted as the loss incurred or passed on to a medical provider. But, the Court ruled that, in any event, this was inapplicable to a PIP claim. Id. at 1053. The Court noted "that the `loss' in this case refers to the injury suffered by the insured for which he or she was covered under the PIP policy, and not to the actual rendering of medical services." Id. at 1053 n. 5.

IV.
Here, defendants seek to enforce a contract to which they are not a party. Regardless, assuming defendants could be a party, Parkway was not requested to provide written authorization prior to the purported assignment of the policy benefits, a condition precedent to a valid assignment. Thus, even if defendants could have standing, that standing would not be valid due to the policy holder not properly assigning the policy to the defendant assignees.
Generally, one may not claim standing to assert the rights of a third party under a contract. Jersey Shore Med. Center-Fitkin Hosp. v. Estate of Sidney Baum, 84 N.J. 137, 144, 417 A.2d 1003 (1980) (citations omitted). A person who is not a party to a contract but who merely benefits from the contract can not sue to enforce the contract solely because they may benefit from the contract. Model Jury ChargesCivil 4.18 (citing Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73, 11 A.2d 83 (E. & A.1940)).
Here, it is undisputed that defendant medical providers are not parties to the policy between the insured and insurer. Rather, the medical providers are incidental beneficiaries of the policies, thus having no standing to pursue these claims. As such, the courts have clearly stated that an incidental beneficiary, not a party to a contract, cannot sue to enforce that contract. First National State Bank v. Carlyle House, Inc., 102 N.J.Super. 300, 322, 246 A.2d 22 (Ch.Div.1968), aff'd o.b., 107 N.J.Super. 389, 258 A.2d 545 (App.Div. 1969), certif. denied, 55 N.J. 316, 261 A.2d 359 (1970). "Rather, for a third party to enforce a contract, it must clearly appear that the contract was made by the parties with the intention to benefit the third party" and that "the parties to the contract intended to confer upon him the right to enforce it." Id. at 322, 246 A.2d 22. "The contractual intent to recognize a right to performance in the third person is the key." Broadway Maintenance Corp. v. Rutgers, 90 N.J. 253, 259, 447 A.2d 906 (1982). It is clear to this court that Parkway did not intend to recognize a third party's purported right to any benefit, nor *1230 did Parkway intend to grant a third party an unqualified assignable right enforceable in arbitration or court. The Parkway policy of insurance clearly mandates an assignment can not be made by the insured without prior written consent from the insurer.
As recognized in Parrish, the statutory language in New Jersey grants the insurer the option to pay a purported third party beneficiary but does not compel the insurer to pay the medical provider. Specifically, the language reads "may be paid by the insurer," not "must" be paid. If the legislators had intended a strict standard compelling the insurers to pay medical providers directly, the language would have been constituted differently. As such, the court finds that the statute grants the insurer the option of paying the insured or the medical providers directly.
Consequently, the New Jersey clause will be given the same effect it has been given in Colorado, Connecticut, Pennsylvania, Kansas, Delaware, Nebraska and the District of Columbia. This court finds that the purported assignment of benefits to a medical provider, in the face of a non-assignment clause in Parkway's insurance policy, is void and unenforceable against it. The aforementioned authority, with which this court agrees, is grounded in the principle that "the public policy in favor of the freedom of contract, and the corollary right of the insurer to deal only with the party with whom it contracts, outweighs the general policy favoring the free alienability of choses in action." Parrish Chiropractic Centers, P.C. v. Progressive Casualty Insurance Company, supra, 874 P.2d at 1054.
Parkway has not sought to avoid liability, but has, rather, sought to enforce the terms of a contract that specifically address the manner in which an assignment may occur. It would be inequitable and unjust to allow medical providers to dictate terms of a contract to which they are not a party. Insureds and purported assignees should not have the right to select sections of a contract they wish to honor.

V.
Additionally, defendants have argued that Parkway should be equitably estopped from refusing to accept the assignments which the medical providers obtained before providing treatment. This argument overlooks the fact that the payments may be made as authorized by the insurance policynot as a result of the purported assignment. What they seek is to penalize Parkway for making prompt payments before it has completed its investigations, examinations under oaths, independent medical examinations, review of the medical providers' records and peer reviews. Such investigations and reviews can require many months, and even longer when, as in this case, the claimants and medical providers are uncooperative. Hence, the equities weigh far more heavily in favor of Parkway than the medical providers.
"The doctrine of equitable estoppel is designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to the demands of justice and good conscience." W.V. Pangborne & Co. v. N.J. DOT, 226 N.J.Super. 367, 372, 544 A.2d 423 (App. Div.1988) (citing Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 403 A.2d 880 (1979)), rev'd, 116 N.J. 543, 562 A.2d 222 (1989). The essential principle of the doctrine of equitable estoppel is that one may be precluded only by one's voluntary conduct in taking a course of action which would work an injustice and wrong to a party relying, with good reason and good faith, on that conduct. The doctrine of equitable estoppel was developed to balance the interests of one party against another, in view of action and reliance on the parties' behalf, with principles of equity. This, in essence, manifests the principle of fairness to both parties. The doctrine of equitable estoppel, however, is to be used only in compelling *1231 circumstances. This case does not indicate compelling circumstances.
There is no basis to invoke equitable estoppel against Parkway. Therefore, the court declares that defendants are bound by the policy provision prohibiting assignment of benefits without the written consent of Parkway. The purported assignments to the medical providers are void and unenforceable against Parkway, and all AAA arbitrations instituted by these defendants are dismissed.
NOTES
[1] The Department of Banking and Insurance was created in 1891 (L.1891, c. p. 17), now N.J.S.A. 17:1-1. The department, having been divided into two separate principal departments, the Department of Banking, pursuant to P.L.1970, c. 11 (C. 17:1B-1 et seq.), and the Department of Insurance, pursuant to P.L.1970, c. 12 (C. 17:1C-1 et seq.), was recombined and designated as the Department of Banking and Insurance, effective July 1, 1996. N.J.S.A. 17:1-1.
[2] This statute was amended again, effective January 1, 1998, to add "in accordance with policy terms approved by the commissioner." This amendment has no effect on this case.